UNITED STATES of America,
Plaintiff-Appellee,

v.

Ana Luisa GORDON–NIKKAR,
Defendant-Appellant.

No. 75–1950
Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

Sept. 5, 1975.

* Rule 18, 5 Cir.; see *Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al.*, 5 Cir., 1970, 431 F.2d 409, Part I.

Lewis S. Kimler, Miami, Fla. (court appointed), for defendant-appellant.

Robert W. Rust, U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before COLEMAN, AINSWORTH and SIMPSON, Circuit Judges.

AINSWORTH, Circuit Judge:

Appellant, Ana Gordon-Nikkar, was convicted after a trial by jury on all three counts of an indictment charging her with conspiracy to possess with intent to distribute approximately four kilograms of cocaine, and the substantive charges of possession with intent to distribute and distribution of the cocaine. 21 U.S.C. §§ 841(a)(1), 846. On appeal, appellant contends her conviction should be reversed because the district court permitted a Government witness, Brenda Marchand, to give testimony regarding allegedly privileged conversations between appellant's attorney and his clients, and because the trial court denied appellant's motion to quash the jury panel on account of the exclusion of resident aliens from grand and petit juries. We affirm.

I.

Brenda Marchand was charged as a codefendant with the crimes for which appellant was convicted. Marchand subsequently pled guilty on Count I of the indictment and testified at trial for the Government. Prior to entering her plea, Marchand had two meetings in the office of appellant's attorney, Mr. Estrumsa.[1] On each of these occasions, several of the codefendants were present. Marchand, however, was not a client of Estrumsa, and it is unclear whether all the other persons in these meetings were Estrumsa's clients. Of the two conversations related by Marchand, the second was the subject of thorough cross-examination by Estrumsa. The second conversation involved Estrumsa's alleged recommendation that Marchand leave the country and go to Venezuela. On redirect, the Government inquired, over defense objection, into the substance of the conversation during the first meeting. Marchand testified that at this meeting the participants, at Mr. Estrumsa's suggestion, agreed to give perjured cover-up testimony at trial to the effect that none of them had possessed the cocaine, but instead merely happened to be at a party where the cocaine was discovered.

---

1. The defense does not contend that Marchand's presence in the attorney's office during the conversations was a deliberate and surreptitious invasion by a government agent into the legal camp of the defense. Cf. Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

The principal issue in this regard is whether the statements in attorney Estrumsa's office were protected by the attorney-client privilege.[2] There were at least five persons present at Estrumsa's office on this occasion; at least one of the persons, Brenda Marchand, and perhaps others, were not clients of Mr. Estrumsa. A communication divulged to "strangers" or outsiders can scarcely be considered a confidential communication between attorney and client. *See In re Grand Jury Proceedings,* 5 Cir., 1975, 517 F.2d 666; *United States v. Blackburn,* 5 Cir., 1971, 446 F.2d 1089, 1091; *International Business Machine Corp. v. Sperry Rand Corp.,* D.Del., 1968, 44 F.R.D. 10, 12; *United States v. United Shoe Machinery Corp.,* D.Mass., 1950, 89 F.Supp. 357, 358; 8 Wigmore on Evidence § 2311 (McNaughton Rev.1961). Therefore, this communication is not protected by the attorney-client privilege. But even if it appeared that the communication in question were otherwise privileged (i. e., that the communication was considered confidential despite the presence of a stranger), the testimony was nonetheless admissible. The conversations in question dealt with plans to commit perjury so as to hide the criminal activity of appellant and others. It is beyond dispute that the attorney-client privilege does not extend to communications regarding an intended crime. *See* 8 Wigmore on Evidence § 2298 (McNaughton Rev.1961) and cases cited; *Pollock v. United States,* 5 Cir., 1953, 202 F.2d 281, 286. The policy underlying the attorney-client privilege is to promote the administration of justice. It would be a perversion of the privilege to extend it so as to protect communications designed to frustrate justice by committing other crimes to conceal past misdeeds.

## II.

Appellant next argues that the trial court erroneously refused to quash the petit jury venire as requested on the ground that the exclusion therefrom of resident aliens deprived her of her right to trial before a jury representing a fair cross-section of the community. The right and duty to act as grand or petit jurors is presently reserved to citizens. "Any *citizen* of the United States . . . is competent to serve as a grand or petit juror." 28 U.S.C. § 1861 (emphasis added). *See also* 28 U.S.C. § 1865. This statutory mandate serves to exclude otherwise eligible resident aliens from jury service. All defendants at the trial below were of Cuban origin. Defense counsel alleged to the trial court that in Miami, where the trial took place, 30 per cent of the city's population are resident aliens, mostly of Cuban descent. It is contended that the exclusion of otherwise eligible resident aliens under these circumstances deprived appellant of a fair trial.

It is true that the Supreme Court has held that the Sixth Amendment right to an impartial jury encompasses a fundamental right to trial by a jury which is a truly representative cross-section of the community. *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *see Peters v. Kiff,* 407 U.S. 493, 498, 92 S.Ct. 2163, 2166, 33 L.Ed.2d 83 (1972); *Glasser v. United States,* 315 U.S. 60, 86, 62 S.Ct. 457, 472, 86 L.Ed. 680 (1942).[3] Despite this requirement, however, "it has never been thought that federal juries must be drawn from a cross-section of the *total* population without the imposition of any qualifications." *United States v. McVean,* 5 Cir., 1971, 436 F.2d 1120, 1122, *cert. denied,* 404 U.S. 822, 92 S.Ct. 45, 30

---

2. While the Government contended that the statements were not privileged, it also defended inquiry into the conversation not touched on during cross-examination as "completion of an area only partially explored on cross-examination." *United States v. Koss,* 2 Cir., 1974, 506 F.2d 1103, 1113.

3. We assume, without deciding, that resident aliens of Cuban descent in Miami constitute an "identifiable segment" or a "distinctive group" in that community. *Cf. Taylor v. Louisiana, supra.*

L.Ed.2d 50 (emphasis in original). Thus, if citizenship is a reasonable qualification for jury duty and resident aliens may properly be excluded from jury service, no Sixth Amendment violation results from such an exclusion. The "truly representative cross-section" requirement encompasses only individuals qualified to serve as jurors. Our inquiry is thus whether the Government can constitutionally impose citizenship as a qualification for jury service.

■ In a series of cases as recent as 1973, the Supreme Court has held that aliens are protected by the Equal Protection Clause of the Fourteenth Amendment, and that classifications based on alienage are inherently suspect and subject to close judicial scrutiny. *In re Griffiths,* 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973); *Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973); *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *Takahashi v. Fish and Game Commission,* 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948); *cf. Truax v. Raich,* 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915); *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). While all the previous cases involved challenges based on the Equal Protection Clause of the Fourteenth Amendment to discrimination by states on the basis of alienage, the same analysis is applicable to the Due Process Clause of the Fifth Amendment, which relates to classifications by the Federal Government. *See Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1953). If a classification is invalid under the Equal Protection Clause of the Fourteenth Amendment, it is also invalid under the Due Process Clause of the Fifth Amendment. *Johnson v. Robinson,* 415 U.S. 361, 363 n. 4, 94 S.Ct. 1160, 1164 n. 4, 39 L.Ed.2d 289 (1974); *see Richardson v. Belcher,* 404 U.S. 78, 81, 92 S.Ct. 254, 257, 30 L.Ed.2d 231 (1971). Because alienage is a suspect classification, the Federal Government must therefore demonstrate that it has a compelling state interest in confining the selection of jurors to those who are citizens.

■ The precise issue before this court was considered in *Perkins v. Smith,* D.Md., 1974, 370 F.Supp. 134 (three-judge court), appeal docketed, 43 U.S. L.W. 3001 (U.S., June 21, 1974) (Docket No. 73–1915).[4] In *Perkins,* the court held that there was a compelling state interest in restricting jury service to citizens, and upheld the federal statutory scheme excluding non-citizens from jury service. We agree with the court's conclusion that there was a compelling interest "in ensuring that persons who serve as jurors are personally committed to the proper application and enforcement of the laws of the United States" which therefore justifies the exclusion of aliens. *Perkins v. Smith, supra,* 370 F.Supp. at 142 (concurring opinion). The following discussion from *Perkins* is pertinent:

> In maintaining the jury system as "the very palladium of free government" the states logically can anticipate that native-born citizens would be conversant with the social and political institutions of our society, the customs of the locality, the nuances of local tradition and language. Likewise naturalized citizens, who have passed through the citizenship classes sponsored by the Immigration and Naturalization Service, have demonstrated a basic understanding of our form of government, history and traditions. There is no corresponding basis for assuming that resident aliens, who owe allegiance not to any state or to the federal government, but are subjects of a foreign power, have so assimilated our societal and political mores that an equal reliance could be placed on their performing as well as citizens the duties of jurors in our judicial system.
>
> The nature of the operation of juries makes it apparent that persons unfit

---

4. In *Carter v. Jury Commission,* 396 U.S. 320, 332, 90 S.Ct. 518, 525, 24 L.Ed.2d 549 (1970), the Supreme Court in dictum commented that

states are "free to confine the selection [of jurors] to citizens . . . ."

for jury service can work a great deal of harm, through inability or malice, to efficiency and fairness. Jury deliberations are perhaps the most secret form of decision-making in the nation; the means of persuasion used by jurors on each other are never revealed. A single juror who failed to understand the import of the evidence being presented or who lacked any concern for the fairness of the outcome could severely obstruct or distort the course of justice. A single persuasive and unprincipled juror could even direct the course of justice into channels deliberately chosen for their deleterious effect on this country. We conclude, therefore, that the state has a compelling interest in the restriction of jury service to those who will be loyal to, interested in, and familiar with, the customs of this country.

Resident aliens by definition have not yet been admitted to citizenship. Until they become citizens, they remain in most cases legally bound to the country of their origin. Nothing is to prevent their return to that country, or a move to yet a third nation. It is true that many, if not most, aliens do intend to become citizens, and that their loyalty could probably be counted upon. However, it is the process of filing for citizenship that establishes that loyalty; any attempt at prior screening would undercut the efficiency and significance of existing procedures. Therefore, although the presumption that all aliens owe no allegiance to the United States is not valid in every case, no alternative to taking citizenship for testing allegiance can be devised, so that we conclude that the classification is compelled by circumstances, and that it is justifiable.

370 F.Supp. at 138.

While we are satisfied that the Government has a compelling state interest sufficient to uphold the statute as constitutional, there is another reason why aliens may be excluded from federal juries. Under Article I, section 8, clause 4 of the Constitution, Congress is granted the power "to establish an uniform Rule of Naturalization." This specific grant of authority vests in Congress the plenary, unqualified power to determine which aliens shall be admitted to this country, the period they may remain, and the terms and conditions of their naturalization. *Graham v. Richardson, supra,* 403 U.S. at 377, 91 S.Ct. at 1854; *Takahashi v. Fish and Game Comm'n, supra,* 334 U.S. at 419, 68 S.Ct. at 1142; *Hines v. Davidowitz,* 312 U.S. 52, 66, 61 S.Ct. 399, 403, 85 L.Ed. 581 (1941); *see also Harisiades v. Shaughnessy,* 353 U.S. 72, 77 S.Ct. 618, 1 L.Ed.2d 652 (1957); *United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317 (1950).

The plenary authority to admit or exclude aliens necessarily permits Congress to place certain conditions on an alien's right of entry or continued residence. *Silverman v. Rogers,* 1 Cir., 1970, 437 F.2d 102, 107, *cert. denied,* 402 U.S. 983, 91 S.Ct. 1667, 29 L.Ed.2d 149; *see Perdido v. I.N.S.,* 5 Cir., 1969, 420 F.2d 1179, 1181. While resident aliens are entitled to the full protection of this country's laws, until they obtain and maintain citizenship by naturalization they are subject to the plenary authority of Congress' immigration and naturalization powers. *Carlson v. Landon,* 342 U.S. 524, 534, 72 S.Ct. 525, 531, 96 L.Ed. 547 (1952). Thus, while most *state* classifications based on alienage are inherently suspect, *Graham v. Richardson, In re Griffiths, Sugarman v. Dougall, Takahashi v. Fish and Game Comm'n, supra,* the same is not true of all such federal classifications where Congress' plenary authority in the field of immigration is involved.

Although Congress may not single out aliens for discriminatory treatment in matters not related to the furtherance of its naturalization responsibilities, *Ramos v. United States Civil Service Comm'n,* D.P.R., 1974, 376 F.Supp. 361, 366 (three-judge court), Congress has the power to define reasonable prerequisites to an alien's exercise of the rights and duties of citizenship. We be-

lieve that preventing resident aliens from serving as jurors is rationally related to Congress' legitimate power to define the extent of resident aliens' rights prior to obtaining citizenship. Recently, the Supreme Court stated that a state may deny to aliens the opportunity to participate in the electoral process because of a "State's historical power to exclude aliens from participation in its democratic political institutions" and its "constitutional responsibility for the establishment and operation of its own government," *Sugarman v. Dougall, supra,* 413 U.S. at 648, 93 S.Ct. at 2850–2851. If a state has the inherent power to deprive aliens of the right to vote, Congress, with its broad powers in dealing with aliens, may validly require citizenship as a prerequisite to service on federal juries. *Cf. Ramos v. United States Civil Service Comm'n, supra,* 376 F.Supp. at 367 n. 9; *Perkins v. Smith, supra,* 370 F.Supp. at 139 n. 1 (concurring opinion). Since Congress may validly exclude aliens from jury service, appellant was deprived of no Sixth Amendment right by the failure to have resident aliens included in the grand or petit jury venires.

Affirmed.