Edmund FOLEY, Individually and on behalf of all other persons similarly situated, Plaintiff,

v.

William G. CONNELIE, Individually and in his capacity as Superintendent of the New York State Police, and A. S. Smith, Individually and in his/her capacity as Director of Personnel of the New York State Police, Defendants.

No. 75–Civ. 4548 (MP).

United States District Court,
S. D. New York.

July 8, 1976.

Jonathan Weiss, New York City, for plaintiff.

Louis J. Lefkowitz, Atty. Gen., New York City, for defendants; by Judith A. Gordon, New York City, of counsel.

Before MANSFIELD, Circuit Judge, and POLLACK and WERKER, District Judges.

## OPINION

WERKER, District Judge.

Plaintiff Edmund Foley, a citizen of the Republic of Ireland, is living in the State of New York as an alien, lawfully admitted for permanent residence in the United States. Plaintiff applied for an appointment as a New York state trooper and was refused permission to take the competitive examination because he is not a United States citizen. Plaintiff brought this suit as a class action for a declaration that Section 215(3) of the Executive Law of the State of New York insofar as it excludes aliens from employment as New York state troopers is a violation of the equal protection clause of the fourteenth amendment of the Constitution of the United States and for an injunction against its enforcement. The purported class is identified as the plaintiff and all other alien residents of the State of New York who have applied or will apply for the position of state trooper, and who have been or will be refused permission to take the competitive examination and who have been or will be denied consideration for the position on the grounds of alienage.

The defendants are William G. Connelie, individually and in his capacity as Superintendent of the New York State Police, and S. A. Smith, individually and in his capacity as Director of Personnel of the New York State Police.

The parties have entered into several stipulations. First they have agreed that the action should proceed as a class action and that Edmund Foley is the representative of that class. Second they agreed that a three-judge court should be convened. The parties also agreed that the plaintiff be permitted to take the competitive examination scheduled for September 20, 1975. On September 19, 1975 the Honorable Milton Pollack entered an order which incorporated the parties' agreement as to the examination with the additional proviso that the test results not be implemented and no rights attach therefrom unless and until the court so directs. Judge Pollack also entered an order on December 30, 1975 authorizing the action to proceed as a class action with plaintiff as its representative and requiring the convening of a three-judge court. Upon the hearing of this matter on April 15, 1976, the parties agreed to submit the matter to the court on the record as it had been constituted on that date [1] for a final resolution on the merits, and both parties waived their right to offer any additional evidence. For the reasons set out below we uphold the constitutionality of § 215(3).

New York Executive Law § 215(3) (McKinney 1972) reads in pertinent part:

"No person shall be appointed to the New York State police force unless he shall be a citizen of the United States."

The statute clearly excludes aliens from employment as state troopers,[2] and the State admittedly adheres strictly to its mandate. If an alien wishes to become a New York state trooper he must give up his foreign citizenship and become an American citizen.

■ As early as 1886, the Supreme Court held that aliens are "persons" within the meaning of the Fourteenth Amendment and are thus protected by the Equal Protection Clause against discriminatory state action. *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). That holding has been affirmed many times since and is no longer open to dispute. *In re Griffiths,* 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973); *Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973); *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *Takahashi v. Fish & Game Commission,* 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948).

The Supreme Court has on four recent occasions had an opportunity to examine employment prohibitions against aliens, and consideration of the statute under attack here must begin with a discussion of those four cases.

In *Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973), the Supreme Court invalidated section 53(1) of the New York Civil Service Law which made any person who was not a citizen of the United States ineligible for appointment to the competitive branch of the New York civil service. Relying on *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), the Supreme Court classified aliens as a "discrete and insular minority" and thus held that classifications based on alienage are subject to strict scrutiny. The Court stated that there were narrow limits on a state's power to apply its laws exclusively to alien inhabitants. *See Takahashi v. Fish & Game Commission,* 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948). The Court, in evaluating the statute, looked to the substantiality of the state's interest

---

1. The record consists of Plaintiff's Verified Complaint and Amended Complaint, with the exhibits attached thereto; Plaintiff's order to show cause and Memorandum in Support of Plaintiff's Motion for a Temporary Restraining Order; Edmund Foley's Affidavit; Plaintiff's Memorandum and Reply Memorandum in Support of Plaintiff's Motion for Summary Judgment and the exhibits attached thereto; Defendant's Answer to the Amended Complaint; and William G. Connelie's Affidavit.

2. *See also* New York Public Officers Law § 3–b (Supp.1975).

in enforcing it and to the narrowness of the limits within which the discrimination was confined. The Court was clear in defining alienage as a suspect classification and in requiring a compelling state interest to justify any discrimination based upon it. However, to apply this case properly to the case at bar, it is equally important to distinguish the factual circumstances that the Court confronted in *Sugarman* and those which are before us today and to recognize the limits which the Supreme Court explicitly put on its *Sugarman* holding.

The statutory scheme within which section 53(1) is included created a New York civil service of four classes.[3] The first was an exempt class of higher executive, municipal and judicial offices and positions for which an examination might be found impracticable.[4] The positions in this class include, among others, Counsel to the Governor, Director of the State Lottery, Executive Assistant to the Superintendent of Banks, and the Coordinator for Non-Public School Services.[5] The second was a non-competitive class which included positions, not otherwise classified, for which a competitive examination would not be practicable but for which appointment was made by non-competitive examination.[6] Included in this class were positions such as chauffeurs, janitors, locksmiths, and the tree pruners in all state departments and agencies, as well as various specific positions in many departments.[7] The third class consisted of unskilled laborers whose positions could not be examined for competitively,[8] such as farmhands, kitchen helpers, parking lot attendants, and school monitors.[9] The citizenship requirement was inapplicable to all of the positions in each of these branches. The fourth branch, qualification to which was determined by the results of a competitive examination, was the only branch which excluded non-citizens. The members of this branch were employed in a wide variety of jobs including typists, file clerks, and sanitationmen.

In commenting on the statute, the court pointed out that it was not "a legislative scheme that bars some *or all* aliens from closely defined and limited classes of public employment on a uniform and consistent basis." *Sugarman v. Dougall,* 413 U.S. at 639, 93 S.Ct. at 2846 (emphasis added). To the contrary, the Supreme Court found that the state's prohibition of the employment of aliens applied to many positions with respect to which the state's proffered justification had little, if any, relationship. At the same time, the Court went on, the prohibition was not applicable at all to positions that would seem naturally to fall within the state's asserted purpose. We take this to mean, contrary to plaintiff's position, that the state, upon a proper showing of a compelling interest, could by means of a precisely drawn statute, exclude all aliens from certain employment.

The majority opinion stated explicitly: "We recognize a State's interest in establishing its own form of government, and in limiting participation in that government to those who are within 'the basic conception of a political community.' *Dunn v. Blumstein,* 405 U.S. 330, 344 [92 S.Ct. 995, 1004, 31 L.Ed.2d 274] (1972). We recognize, too, the State's broad power to define its political community." *Sugarman v. Dougall, supra,* at 642–43, 93 S.Ct. at 2848.

The Court's opinion contains two other significant statements which show the limit of its reach:

---

3. New York Civil Service Law § 40 (McKinney 1973).

4. *Id.* § 41.

5. For a complete listing of the many positions included in this class, *see* 4 NYCRR, Appendix 1 (1975).

6. New York Civil Service Law § 42 (McKinney 1973).

7. For a complete listing, *see* 4 NYCRR, Appendix 2 (1975).

8. New York Civil Service Law § 43 (McKinney 1973).

9. For a complete listing, *see* 4 NYCRR, Appendix 3 (1975).

"[W]e do not hold that, on the basis of an individualized determination, an alien may not be refused . . . public employment, even on the basis of noncitizenship, if the refusal to hire . . . rests on legitimate state interests that relate to qualifications for a particular position . . . . We hold only that a flat ban on the employment of aliens in positions that have little, if any, relation to a State's legitimate interest, cannot withstand scrutiny under the Fourteenth Amendment."

.    .    .    .    .

"Neither do we hold that a State may not, in an appropriately defined class of positions, require citizenship as a qualification for office." *Id.* at 646, 93 S.Ct. at 2850.

The Court concluded its opinion by reiterating its position that "alienage itself is a factor that reasonably could be employed in defining 'political community.'"

In the second case, *In re Griffiths,* 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973), the Supreme Court overturned a Connecticut statute which disqualified aliens from taking the state bar examination. The Court carefully examined the role of the lawyer and the nature of his profession in light of the heavy burden imposed on the state to justify depriving aliens of employment opportunities. Connecticut sought to justify its position by establishing a link between the fact of citizenship and the powers and responsibilities attorneys carry as officers of the court.

In rejecting this as a basis for discriminating against aliens, the Court stated emphatically that lawyers "are not officials of government by virtue of being lawyers." 413 U.S. at 729, 93 S.Ct. at 2858. The Court relied heavily on *Cammer v. United States,* 350 U.S. 399, 76 S.Ct. 456, 100 L.Ed. 474 (1956), which distinguished between lawyers, as persons who engage in a private profession, and court officials such as "marshals, bailiffs, court clerks or judges . . . [who serve] as officers within the conventional meaning of that term." 350 U.S. at 405, 76 S.Ct. at 459.

The third case is *Hampton v. Mow Sun Wong,* 426 U.S. 88, 96 S.Ct. 1895, 48 L. Ed.2d 495 (1976), in which the Supreme Court invalidated a Civil Service regulation [10] which excluded aliens from employment in the federal civil service. Although this holding was based on the fifth amendment rather than on the fourteenth, it is consistent with *Sugarman* in that it proscribes a broad sweeping prohibition on the hiring of aliens. The prohibition reached every job in the federal civil service; no attempt had been made to identify those sensitive positions for which citizenship would be "an appropriate and legitimate requirement." *Id.* at 115, 96 S.Ct. 1895. In fact, the Court was careful to note that one of the original defendants to the action, the Postal Service, was no longer playing an active role in the appellate litigation because in response to "recent Federal litigation" it had promulgated a regulation that limited any exclusion of aliens to a high or "sensitive" level of the Service. *Id.* at 97–98 & n. 13, 96 S.Ct. 1895.

The regulation at issue in *Hampton* was adopted by the Civil Service Commission itself, not by the President or Congress. It is significant for our present purposes that the Court assumed, without deciding, that "Congress and the President have the constitutional power to impose the requirement that the Commission has adopted." At 114, 96 S.Ct. at 1910.

The Commission identified several governmental interests which the President or Congress might consider sufficient to justify the exclusion. It could enhance the President's position in negotiating treaties by enabling him to offer employment to citizens of a particular foreign country in exchange for certain desired concessions. It might also serve as an inducement to resident aliens to qualify for naturalization. The exclusion, which accords with international law and the policy of most foreign countries has been in effect since 1883. Finally, since it was appropriate to exclude

---

**10.** 5 C.F.R. § 338.101 (1976).

aliens from those sensitive positions which required undivided loyalty, the exclusion obviated the need to identify and classify those particular positions thereby reducing administrative effort and expense. As to all but the last of the interests, the Court held that they were not properly the Commission's business, and it rejected the argument that classifying civil service jobs according to their sensitive nature was such an onerous task that a concern for administrative convenience and efficiency justified the wholesale exclusion. However, it is important to note that the Court did assume "that the national interests identified by the [Commission] would adequately support an explicit determination by Congress or the President to exclude all noncitizens from the federal service." At 116, 96 S.Ct. at 1911.

The fourth and most recent case is *Examining Board of Engineers, Architects and Surveyors v. Flores de Otero,* —— U.S. ——, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976) in which the Court invalidated a statute of Puerto Rico which permits only United States citizens to practice privately as civil engineers. Three justifications were offered to support the statute: to prevent the "uncontrolled" influx of Spanish-speaking aliens into the engineering field in Puerto Rico, to raise the prevailing low standard of living, and to provide the client of a civil engineer an assurance of financial accountability if a building for which the engineer is responsible collapses within ten years of construction. *Id.* at ——, 96 S.Ct. 2264.

In considering and rejecting the sufficiency of these reasons, the Court articulated the following standard:

"[T]he governmental interest claimed to justify the discrimination is to be carefully examined to determine whether that interest is legitimate and substantial, and inquiry must be made whether the means adopted to achieve the goal are necessary and precisely drawn." *Id.*

The Court followed the same mode of analysis as it had in *Sugarman v. Dougall, supra* and in *In re Griffiths, supra,* as discussed above and cited those cases repeatedly. It is important to note, however, that the Court again expressly qualified its opinion as it had in *Sugarman* :

"We do not suggest, however that a State, territory or local government, or certainly the Federal Government, may not be permitted some discretion in determining the circumstances under which it will employ aliens or whether aliens may receive public benefits or partake of public resources on the same basis as citizens." *Id.*

It is within the context of these four cases that we must examine the statutory prohibition challenged here. The plaintiff argues that in analyzing the interest asserted by the state in its papers we must subject the use of alienage to close judicial scrutiny. *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971).

In *Graham* the Supreme Court said at 372, 91 S.Ct. at 1852:

[a]liens as a class are a prime example of a 'discrete and insular' minority (see *United States v. Carolene Products Co.,* 304 U.S. 144, 152–153 n. 4 [58 S.Ct. 778, 783–784, 82 L.Ed. 1234] (1938)) for whom [a] heightened judicial solicitude is appropriate.

Consequently, the courts have applied the strict scrutiny or compelling state interest test to cases involving the "discrete and insular minority" of aliens.

However, the Supreme Court in *Sugarman v. Dougall,* 413 U.S. 634, 646, *et seq.,* 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973), articulated an exception to the otherwise broad application of the strict scrutiny test to statutes dealing with this alien minority. It indicated that Courts should not interfere with the states' "historic power to exclude aliens from participating in [those] democratic institutions" which the Courts and people ordinarily rely on to protect minority and individual rights. In striking the statute before it, the Court declared that it should not usurp the states' "responsibility for the establishment and operation of its own government, as well as the qualifications of an appropriately designated class of public office holders."

Writing for the majority, Justice Blackmun stated that the Court's "scrutiny will not be so demanding" where it is faced with the exercise of the "State's constitutional prerogatives," including the state's power to set the qualifications for persons holding "important nonelective executive, legislative, and judicial positions." *Sugarman, supra* at 647, 648, 93 S.Ct. at 2850; *Dunn v. Blumstein,* 405 U.S. 330, 344, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). Thus, it is clear that aliens as a class are unlike other "discrete and insular minorities." The Supreme Court has recognized that the strict scrutiny test cannot be applied unthinkingly to rights and privileges that involve an alien's participation in democratic processes without a corresponding erosion of the notion of citizenship. The classification of alienage, suspect for some purposes, may be permissible when the state is dealing with democratic government and its participants.

Although the courts must be vigilant in protecting certain minority interests where political processes do not provide sufficient protection, the political processes themselves may not be opened to alien participation by such judicial vigilance. A state can reasonably curtail the alien's participation in state government, but it cannot curtail the rights and privileges that ordinarily result from such participation, absent a compelling interest.

The position of state trooper necessarily entails participation in state government to such a degree as to overshadow the fact that eligibility for that position is a governmental benefit normally available to members of the political community. The state trooper's job is not included in the class of "common occupations of the community" to which the shelter of the equal protection clause has been held to extend for the benefit of aliens. *Sugarman v. Dougall,* 413 U.S. 634, 641, 93 S.Ct. 2842, 37 L.Ed.2d 853. This is not a case like *Truax v. Raich,* 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915) in which a state denied aliens lawfully residing within the state the ordinary means of earning a living. The Court there held that "[t]he right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the Amendment to secure." 239 U.S. at 41, 36 S.Ct. at 10. We believe that the state has a special interest in the composition of its police force which justifies exempting it from the class of ordinary occupations from which aliens cannot be excluded.

Positions such as these are designed specifically for the direct preservation and protection of the constitutional rights of all persons within New York State. These are delicate nonelective executive positions made more so by the fact that the performance of the members is largely unsupervised. It is our conclusion that this is an "important nonelective executive . . . position" and these "officers who participate directly in the . . . execution . . . of broad public policy perform functions that go to the heart of representative government." *Sugarman v. Dougall,* 413 U.S. 634, 647, 93 S.Ct. 2842, 2850, 37 L.Ed.2d 853. This is a situation where citizenship bears a vital and essential relationship to the proper performance of the duties of a state trooper.

Accordingly, the Court need not subject the statute under review to quite the close scrutiny applied to statutes in *Graham, Sugarman* and *Griffiths.* However, even applying the stricter test, the Court finds that the statute does not clash with the requirements of the Constitution.

Where a state asserts a compelling state interest to justify statutory discrimination based on a suspect classification, it must establish a very substantial state interest; it cannot choose a means to pursue that interest which unnecessarily burdens or restricts constitutionally protected activity; the statute must be drawn with precision and be tailored to meet legitimate objectives; finally, if there is a less restrictive alternative available that will adequately accomplish its purposes, the state must employ it. *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

The statutory framework of which Section 215(3) is a part is relatively simple and

does not contain the arbitrariness and inconsistency which characterized the Civil Service Law of New York.

Section 31 of the New York Executive Law (McKinney 1972) provides that the state police shall be a division of the executive department. Article 11 of the Executive Law is entitled Division of State Police. It includes sections which detail the organization, powers, duties and benefits of the State Police. Section 223 provides:

"It shall be the duty of the superintendent of the state police and of members of the state police to prevent and detect crime and apprehend criminals. They shall also be subject to the call of the governor and are empowered to co-operate with any other department of the state or with local authorities. They shall have power to arrest, without a warrant, any person committing or attempting to commit within their presence or view a breach of the peace or other violation of law, to serve and execute warrants of arrest or search issued by proper authority and to exercise all other powers of peace officers of the state of New York. Any such warrants issued by any magistrate of the state may be executed by them in any part of the state according to the tenor thereof without indorsement. But they shall not exercise their powers within the limits of any city to suppress rioting and disorder except by direction of the governor or upon the request of the mayor of the city with the approval of the governor. Any member of the rank of sergeant or above may take pre-arraignment bail from any defendant in the amounts and under the circumstances and conditions that police may take bail"

Furthermore the state police are responsible for enforcement of all powers and duties imposed on inspectors and game protectors under the conservation law [11] and for performing the duties with respect to found property and instruments imposed by the personal property law.[12] The definition of "state officer" provided in § 2 of the New York Public Officers Law (McKinney 1952) seems to include the state police and it has been so interpreted by the State Attorney General. Op.Atty.Gen., 13 St. Dept. 430 (1917). That opinion differentiated between the members and officers of the state police on one hand and their clerks and stenographers on the other.

The state police force is the only New York police force with statewide jurisdiction. State police are authorized to effect arrests with and without warrants. The state police protect the Governor and visiting foreign dignitaries. State troopers must carry weapons when on duty and are authorized to do so while off duty. State police members are on call twenty-four hours a day and must take appropriate action at any time they observe criminal conduct. We believe that the state has adequately demonstrated that these officers bear awesome responsibilities.

State police are charged with the enforcement of the law, not in a private profession and for the benefit of themselves and their clients, but for the benefit of the people at large of the State of New York. Their powers are statewide except to the extent that the direction or approval of the governor is required before they can act to suppress rioting or disorder within the limits of any city.

A state police officer has a highly sensitive and delicate role. To properly perform his function he must be "personally committed to the proper application and enforcement of the laws of the United States." *United States v. Gordon-Nikkar,* 518 F.2d 972 (5th Cir. 1975). This court believes there is a strong similarity between the role played by the juror and the policeman in our society, and it has been often recognized that states and the federal government have a compelling interest which justifies excluding aliens from jury service. *United States v. Gordon-Nikkar, supra; Perkins v. Smith,* 370 F.Supp. 134 (D.Md.

---

**11.** New York Executive Law § 225 (McKinney 1972).

**12.** *Id.* § 226.

1974) (three-judge court), *aff'd,* 426 U.S. 913, 96 S.Ct. 2616, 49 L.Ed.2d 368 (1976). *See Carter v. Jury Commission,* 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970).

We feel it is significant, though not dispositive, that at least twenty-nine other states [13] and numerous foreign countries [14] have enacted a citizenship requirement for members of the state or national police force. As Justice Jackson once said, "The mere fact that a path is a beaten one is a persuasive reason for following it." [15] While frequent use cannot validate a practice otherwise violative of the equal protection clause, we believe the prevalence of this requirement is probative of the existence of a legitimate and profound state interest: *i. e.,* the concern about the ability of an alien to execute properly the functions of a state police officer. This is a concern which cannot be easily disregarded.

One further factor compels the court to adopt this conclusion. The state police force is responsible for detecting and preventing not only common crime but also subversion, incitement to riot and the quelling of public disorders. The equal protection clause most certainly does not deny to each state a right to limit its police force to those persons whom it believes will be most interested in its self-preservation. A state cannot afford the risk of employing as a state trooper a person whose inclination to apply justly the laws of the state and federal government and whose spirit and enthusiasm for the customs and traditions of American life the state doubts. His possible allegiance to a foreign sovereign is more than adequate to give rise to doubt until such time as an alien makes the important step of becoming a naturalized citizen. The state may harbor serious concern as to that individual's commitment to the United States and the enforcement of its statutes and Constitution. The state thus has a compelling interest which justifies its decision to exclude aliens.

The dissent asserts that the State has made no showing that an alien would be less likely than a citizen to live up to the state policeman's oath to equitably enforce the laws against both aliens and citizens. Actually, the state has enumerated several characteristics which distinguish alien status from citizen status. These factors must necessarily create divided loyalties and thus diminish the alien's ability to faithfully fulfill a policeman's responsibilities.

Until an alien is admitted to citizenship, he enjoys special privileges and bears cer-

**13.** A verification of the information supplied to the court by the defendants and the FBI yielded the following statutes: Alaska Stat. § 39.05.010 (1962); Ariz.Rev.Stat.Ann. § 38–201 (1974); Ark.Stat.Ann. § 42–406 (1964); Fla.Stat.Ann. § 943.13(2) (Supp.1976); Ga.Code Ann. § 92A–214 (1972); Hawaii Rev.Stat. § 78–1 (1968); Ill.Rev.Stat. ch. 121, § 307.9 (1965); Ind.Admin. Rules and Regs. (47–848)–1 (1967); Iowa Code Ann. § 80.15 (1949); Kan.Stat.Ann. § 74–2113 (Supp.1975); Ky.Rev.Stat. § 16.040(2)(c) (Supp.1974); Mass.Gen.Laws Ann. ch. 31, § 12 (Supp.1975); Mich.Stat.Ann. § 28.4 (1967); Miss.Code Ann. § 45–3–9 (1972); Mo.Rev.Stat. § 43.060 (1969); Mont.Rev.Codes Ann. § 31–105(3)(a)(v) (Supp.1975); Nev.Rev.Stat. § 281.-060(1) (1975); N.H.Rev.Stat.Ann. § 106–B:20 (Supp.1975); N.J.Rev.Stat. § 53:1–9 (Supp. 1975); N.M.Stat.Ann. § 39–2–6 (1972); N.D. Cent.Code § 39–03–04(4) (Supp.1975); Ohio Rev.Code § 124.22 (1974); Okl.Stat.Ann. tit. 47, § 2–105(a) (Supp.1975); Or.Rev.Stat. § 181.-260(1)(a) (1971); Pa.Stat.Ann. tit. 71, § 1193 (1962); R.I.Gen.Laws Ann. § 42–28–10 (1970); S.D.Compiled Laws Ann. § 3–7–9 (1974); Tex. Rev.Civ.Stat.Ann. art. 4413(9)(2) (1966); Utah

Code Ann. § 27–11–11 (1969). In addition, other states may have enacted a citizenship requirement by rule or regulation; the defendants have informed the court that at least Maine, Maryland and Nebraska have each done so.

**14.** *See, e. g.,* Aliens Restriction Act, 9 & 10 Geo. 5, c. 92, § 6 (1919), *as amended* Aliens Employment Act, 4 Eliz. 2, c. 18 (1955); Ordinance No. 59–244, Art. 16 (1959) (France); Bundeskeamtengesitz, § 7(1) (1953) (Germany); Statuto degli Impiegati Civili delto Stato, Art. 2: (1) (Italy); Grondwet voor het Koninkrijk der Nederlanden, Art. 5(2) (Netherlands); Bundesgesetz uker das Dienstverhaltnis der Bundesbeamten, Art. 2 (1927) (Switzerland). *See generally* Public Administration Branch, Department of Economic and Social Affairs, United Nations, Handbook of Civil Service Laws and Practices. (1966).

**15.** Jackson, Full Faith and Credit—The Lawyer's Clause of the Constitution, 45 Col.L.Rev. 1, 26 (1945).

tain burdens not shared by citizens. These privileges and burdens betoken his continuing allegiance to the country of his nationality. The resident alien "retains a claim upon the state of his citizenship to diplomatic intervention on his behalf." *Harisiades v. Shaughnessy,* 342 U.S. 580, 585, 72 S.Ct. 512, 517, 96 L.Ed. 586 (1952). *See also* C. Harper, *Immigration Laws of the United States,* Part VII, § 1(a) at 567 (3d ed. 1975). He is subject to that country's powers of conscription and taxation, E. Borchard, *Diplomatic Protection of Citizens Abroad,* § 13 at 22–23 (1927). He may not be obliged to fight against that country, Art. 23, *1907 Hague Convention Respecting the Laws and Customs of War on Land,* 36 Stat. 2301–2302, or in any military confrontation concerning which that country is neutral, 4 J. Moore, *International Law Digest,* § 3648, at 52–53 (1906). Aliens are eligible for the United States draft only if they have immigrant status, 32 C.F.R. § 1611.2(a), and an immigrant may obtain an exemption pursuant to treaty, *cf.* 8 U.S.C. § 1101, or change his status to non-immigrant, 8 U.S.C. § 1257(a).

The federal government has the power to deport a resident alien, *e. g.,* 8 U.S.C. § 1251, *Carlson v. Landon,* 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1951); to expel him in the event of hostilities with the country of his nationality, *Borchard, supra,* § 46, at 109; to take less drastic measures such as detention, concentration or prohibition of residence in certain defined areas, *Borchard,* § 46, at 113; and to deny him re-entry if he leaves the country, *e. g.,* 8 U.S.C. § 1182(a)(20).

The limbo of loyalty that results from these rules continues for a period of at least five years, 8 U.S.C. § 1427, and it is not for this Court to question the support for such a time period. *See Kleindienst v. Mandel,* 408 U.S. 753, 766, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972); *Harisiades, supra; Lem Moon Sing v. United States,* 158 U.S. 538, 547, 15 S.Ct. 967, 39 L.Ed. 1082 (1895). The resident alien's status is one that cannot but

reflect on and affect his ability to uphold the laws of this country, allegiance to which is insured only after naturalization and the consequent removal of the above-enumerated ties to a foreign state. The state quite rightly observes that conflicts of allegiance would be most glaring with respect to the alien's duty as a state policeman to make arrests of violators of the federal immigration laws, to participate in the Governor's Detail which provides protection for the Governor and visiting foreign dignitaries, to conduct investigations into matters having to do with government security, and to provide security at events involving foreign visitors such as the 1980 Winter Olympics to be held in Lake Placid, New York.

The dissent describes such potential conflicts as theoretical, offering as an alternative "theory" the suggestion that an alien would be "especially careful" to enforce the laws against fellow aliens in order to avoid the appearance of partiality and to curtail the activities of anyone who would cast disgrace on aliens as a group. The notion that an alien state policeman would be tougher on fellow aliens suggests the very type of partiality the state police ought carefully to avoid, and the argument that an alien would be concerned about the group image of aliens *in general* is indeed theoretical, if not implausible. This alternative "theory" and the dissent's final suggestion that aliens would enforce the laws just as citizen state policemen do are far outweighed by the compelling arguments of the state in favor of restricting to citizens the sensitive job of protecting and, when required, arresting aliens and citizens alike.

We find that the state has a substantial and compelling interest in requiring the members of the state police force to be citizens and that interest is the maintenance of public order to effect the preservation of the political structure including the prevention, detection and prosecution of crime.[16]

The finding of a compelling state interest, however, does not conclude the inquiry

---

**16.** The dissent erroneously decries the absence of evidence to support the majority opinion.

There is ample evidence. Moreover, the dissent's criteria, if accepted, would eliminate the

where a suspect classification is at issue. The state must not choose a means which unnecessarily burdens constitutionally protected activity. As Judge Winter pointed out in his concurring opinion in *Perkins v. Smith, supra,* the group of aliens whose continued and natural commitment to a foreign sovereign would not interfere with an enthusiastic and unconditional enforcement of our laws and public policy is impossible to identify. Only by taking a positive step to renounce his prior allegiance does the alien affirmatively demonstrate the focus of his loyalty, and the Constitution has vested in Congress the exclusive authority to naturalize citizens. United States Constitution, Art. I, § 8, Cl. 4. Thus this court believes there is no less drastic alternative available. Finally, the court finds that the statutory scheme which excludes all aliens from all positions within the state police force is as precisely drawn as the state interest requires.

■ *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), recognized that the state has the power to establish a bona fide residency requirement to preserve its basic conception of the political community. We hold that the power also enables a state constitutionally to establish a citizenship requirement where that requirement is intimately related to a compelling state interest. Each state has a broad power to define its political. community and may limit participation in its government to those who are within that community. *Sugarman v. Dougall,* 413 U.S. 634, 642–43, 93 S.Ct. 2842, 37 L.Ed.2d 853. We thus uphold the constitutionality of Section 215(3) of the New York Executive Law and grant summary judgment to the defendants.

Submit Order.

confirmed citizenship requirement for jurors, assemblymen, city and state officials, F.B.I. agents, congressmen, senators and even the President. The dissent argues, we believe erroneously and theoretically: "[A] properly tested, selected and trained resident alien would [not] be less competent to perform the duties . . would [not] present a poorer security risk or be

MANSFIELD, Circuit Judge (dissenting).

There is not a shred of evidence in the record of this case to indicate, much less prove, that a properly tested, selected and trained resident alien would be less competent than a citizen to perform the duties of a New York state trooper, which admittedly are paramilitary in nature, or that members of the plaintiff class would present a poorer security risk or be less loyal to the State than citizens in the performance of those duties. On the contrary, this country has in practice considered resident aliens not only to be qualified but obligated to perform analogous duties in our armed services. The State of New York has failed completely to sustain its heavy burden under the Equal Protection Clause of demonstrating that the exclusion of noncitizens from service as state policemen is necessary to protect some substantial state interest. Accordingly, I must respectfully dissent.

It is as close to hornbook law as constitutional law can ever be that resident aliens are no longer a group bereft of the protection of the Equal Protection Clause or other provisions of the Constitution. On the contrary, because of their vulnerability to discrimination based on their minority status and their inability to protect their interests through the political process, resident aliens are entitled under the Equal Protection Clause to a careful judicial examination of any efforts to deny them their rights. "[C]lassifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny. . . . Accordingly, . . 'the power of a state to apply its laws exclusively to its alien inhabitants as a class is confined within narrow limits.'" *Graham v. Richardson,* 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534 (1971), quoting *Takahashi v. Fish & Game Comm'n,*

less loyal to the State than citizens in the performance of those duties." (dis. op. sic.) This theory would compel New York State's police to be manned by aliens. The compulsion to admit one requires admission of all. We believe that the citizenship requirement is even more apt under these circumstances.

334 U.S. 410, 420, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948) (footnotes omitted). The strict judicial scrutiny under which the Equal Protection Clause places such classifications demands, of course, that the classification be supported by a substantial state interest and be no broader than necessary to protect that interest.

"The Court has consistently emphasized that a State which adopts a suspect classification 'bears a heavy burden of justification,' *McLaughlin v. Florida,* 379 U.S. 184, 196 [85 S.Ct. 283, 290, 13 L.Ed.2d 222] (1964), a burden which, though variously formulated, requires the State to meet certain standards of proof. In order to justify the use of a suspect classification, a State must show that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is 'necessary . . . to the accomplishment' of its purpose or the safeguarding of its interest." *In re Griffiths,* 413 U.S. 717, 721–22, 93 S.Ct. 2851, 2855, 37 L.Ed.2d 910 (1973) (footnotes omitted).

The fact that the Constitution demands solicitous protection of the rights of resident aliens is once again illustrated by the very recent decision in *Hampton v. Mow Sun Wong,* 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976), where the Supreme Court upheld a challenge, brought under the Fifth Amendment's Due Process Clause, to a U.S. Civil Service Commission rule barring aliens from most federal civil service positions. While the Court acknowledged the "paramount federal power over immigration and naturalization," *id.* at 100, 96 S.Ct. at 1904, and therefore applied a less stringent standard of review to this federal rule than it would to state rules affecting aliens challenged under the Equal Protection Clause, it nonetheless found the government interests advanced in support of the rule insufficient to justify its "impact on an identifiable class of persons who, entirely apart from the rule itself, are already subject to disadvantages not shared

by the remainder of the community," *id.* at 102, 96 S.Ct. at 1905, and accordingly held the rule deprived aliens of liberty without due process of law.

This heightened protection of resident aliens' interests reflects the realization that they should not be treated as distasteful intruders upon our society but rather as welcome participants in it, even though they lack the full political rights reserved for citizens. "Resident aliens, like citizens, pay taxes, support the economy, serve in the Armed Forces, and contribute in myriad other ways to our society. It is appropriate that the State bear a heavy burden when it deprives them of employment opportunities." *Id.,* 413 U.S. at 722, 93 S.Ct. at 2855. To this might be added that they are, like citizens, obligated to obey the laws of this land. The fact that an individual bears the status of resident alien does not, therefore, imply that he rejects the laws and values of the United States; indeed, even those aliens who most fervently support those laws and desire to become citizens must, with relatively few exceptions, remain in the status of resident alien for five years before becoming eligible for naturalization. 8 U.S.C. § 1427(a). Thus they are often unable, simply by the stroke of a pen and the taking of an oath, to "give up" their status immediately or change it to that of American citizen. The record in this case gives no indication that the named plaintiff is not in precisely this situation.[1]

The majority opinion gives lip service to these established principles but then seeks to circumvent their application to the present case by reasoning that the citizenship requirement for the position of state policeman is exempt from the demanding standard of review applied to other classifications based on alienage. The basis for this approach is said to be certain language in *Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973), where, in the course of ruling that the ban of aliens from civil service employment contained in

---

1. Counsel for the plaintiff advises that the plaintiff is, in fact, presently ineligible for naturalization because he has not yet met the five-year residency requirement, and that he will be too old to apply for the State Police after he has been naturalized. (Reply Brief, p. 10).

N.Y.Civil Service Law § 53(1) violated the Equal Protection Clause, Justice Blackmun, writing for eight members of the Supreme Court, stated that the Court would not review so severely a citizenship requirement of

> "persons holding state elective or important nonelective executive, legislative, or judicial positions, for officers who participate directly in the formulation, execution, or review of broad public policy perform functions that go to the heart of representative government." *Id.* at 647, 93 S.Ct. at 2850.

When such positions were involved, Justice Blackmun continued, the State would only be required to make the lesser showing that "citizenship bears some rational relationship to the special demands of the particular position," *id.,* quoting *Dougall v. Sugarman,* 339 F.Supp. 906, 911 (S.D.N.Y.1971) (Lumbard, J., concurring).

When this language quoted from *Sugarman* is viewed in the light of the Court's reasoning behind it, the class of executive officers to which it would apply is clearly a narrow one. The Court's suggestion that the State might prescribe citizenship for some offices without a showing of special need was expressly based upon the State's obligation "to preserve the basic conception of a political community." *Dunn v. Blumstein,* 405 U.S. 330, 344, 92 S.Ct. 995, 1004, 31 L.Ed.2d 274 (1972). Voting and legislating are paradigmatic examples of participation in a political community; to require that aliens, by definition persons not members of that political community, be allowed to exercise these functions would be to erode beyond recognition the concept of a political system and of citizenship. Similarly, some high executive officials, such as governors, cabinet members, and heads of agencies, necessarily possess such broad delegated powers that they inevitably and properly act "politically" by making basic policy choices which shape the future of the political community, in this instance the State of New York. Though such top policy-making officials are, of course, ultimately under the control of the voters and legislators, as a practical matter such officials

are properly acting as leaders of the political community and thus may reasonably be required to be members of it. These are the persons to whom the *Sugarman* opinion referred as those who might reasonably be required to be citizens. See also *In re Griffiths, supra,* 413 U.S. at 729, 93 S.Ct. at 2858 ("one so close to the core of the political process as to make him a formulator of government policy".)

Important as are state policemen—and for that matter other policemen—to the security and well being of the State, their proper function is neither political nor policy-making. Their task is not to elect or legislate but to enforce the law. The governmental policy implemented by them is set out, in considerable detail, in the criminal laws of New York, which it is their duty to enforce. In carrying out that clearly-defined policy the state policeman performs duties which for the most part are essentially ministerial in nature, e. g., the patrolling of highways and guarding of other areas to prevent crime and detect violators; the protection of state officials and buildings; the control of vehicular traffic on state highways; the furnishing of emergency first aid; searches for missing persons; the investigation of crimes, suspected or committed, in response to complaints or for other reasons; the making of arrests and execution of warrants; the interrogation of suspects, arraignment of defendants, and the collection and furnishing of evidence, including expert testimony.

In the performance of these and other similar duties policemen, of course, are not automatons. They do exercise some discretion in law enforcement which may, in particular situations, be said to rise to the level of limited, interstitial policymaking, see generally K. Davis, *Police Discretion* (1975). However, their activities can hardly be regarded as a political function going "to the heart of representative government." *Sugarman v. Dougall, supra,* 413 U.S. at 647, 93 S.Ct. at 2850. New York State itself recognizes that the individual state policeman is not properly a law or policy-maker compa-

rable to a legislator or high executive official; he is not given free rein, but rather is controlled by a chain of command and organization which the State itself describes as "para-military." (Connelie affidavit, ¶ 4). See also 9A N.Y.C.R.R. § 478.7 (regulation emphasizing importance of discipline in state police force).

In short, whatever the range of offices ultimately held to be embraced within those so intimately connected with the State's political processes that the State may, without showing a compelling need, simply mandate that they be filled by citizens only, the position of state policeman, being one which involves the application of settled state law rather than the formulation of new law or policy, is not one of them. Since *Sugarman v. Dougall, supra,* thus provides no basis for lessening the stringent standard to be applied upon judicial review of the statutory disqualification of noncitizens from the State police force, the State must bear the heavy burden of showing that the disqualification is necessary to safeguard a substantial or compelling state interest. See *In re Griffiths, supra,* 413 U.S. at 721–22, 93 S.Ct. 2851; *Graham v. Richardson, supra,* 403 U.S. at 375, 91 S.Ct. 1848. No such showing has been made in this case.

The issue boils down to whether the disqualification of aliens from the force is in any sense necessary to assure that the New York State Police will faithfully perform their duties. The State attempts to provide the necessary link by suggesting that the alien's presumed loyalty toward his country of nationality and his possible partiality toward his fellow aliens may create a conflict of interest in a variety of situations as, for example, when a noncitizen state policeman is called upon to assist federal authorities in enforcing immigration laws, to defend the State against insurrection, or to provide

protection for foreign dignitaries at the 1980 Winter Olympics at Lake Placid.[2]

The State's assumption that a noncitizen state policeman might show partiality toward his fellow aliens may be arguable as a matter of sociological and psychological speculation, but it is no more plausible in theory than the opposite assumption: that the noncitizen state policeman would be especially careful to enforce the laws against fellow aliens, not only to avoid any appearance of partiality but also to prevent the alien lawbreaker from bringing disgrace upon all aliens, including the policeman. Or, it might simply be assumed that noncitizen and citizen policemen will not differ in their attitudes and diligence in enforcing the laws against all persons, much as black and white police officers do not appear to differ appreciably in their attitudes toward police problems, including racially-related ones. See J. Wilson, *Thinking About Crime* 106 (1975). In the present case, all of these theories remain precisely that: just theories. Even if we assume them to be plausible as a matter of general speculation, none is supported by any empirical evidence in the record.

Were the classification created by the state legislature in its enactment of § 215(3) of the Executive Law not to be viewed as a "suspect" one according to clear Supreme Court decisions, e. g., *Sugarman v. Dougall, supra*; *In re Griffiths, supra*; *Graham v. Richardson, supra,* the legislature might escape the stricter standard of review necessitating judicial intervention and rely upon one of these theories as a ground for upholding its action according to the looser rational basis criterion. See, e. g., *Williamson v. Lee Optical Co.,* 348 U.S. 483, 488–89, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *Railway Express Agency Inc. v. New York,* 336 U.S. 106, 109–10, 69 S.Ct. 463, 93 L.Ed. 533 (1949). See generally *Developments in the*

---

**2.** It can easily be doubted how often even these potential conflicts are likely to arise. Though the State, for instance, stressed at oral argument the difficulties which might arise if a noncitizen state policeman were required to arrest illegal aliens, the affidavit by Superintendent Connelie states that the more than

3,000 members of the force made only 200 such arrests in 1974. Other potential conflicts seen by the State—for instance, those perceived from having noncitizen troopers provide security at the Winter Olympics—are clearly avoidable through avoiding assignment of noncitizen troopers to such duties.

*Law–Equal Protection*, 82 Harv.L.Rev. 1065, 1082–87 (1969). However, since the State has here acted to exclude a minority accorded special protection by the Equal Protection Clause, the State must assume the heavy burden of coming forward with evidence that its assumption is not merely plausible but rests on a foundation of fact rather than of speculation. The State has not even attempted to make such a showing to support its idea that a resident alien would be less likely than a citizen to live up to his oath as a policeman to enforce the law against all persons, alien or otherwise.

The State's failure to make the required showing is not remedied by the majority opinion's citation of a hodge-podge of statutes and other materials concerning various aspects of the legal status of aliens. Far from showing as the majority argues, that a permanent resident alien suffers from a "limbo of loyalty," these materials, insofar as they are relevant at all to the present case, point toward the conclusion that permanent resident aliens are, as a group, as law-abiding and loyal as citizens and could be safely employed as state troopers. The majority notes, for instance, that aliens are subject to deportation. However, deportations of permanent resident aliens—the plaintiff class in this case—are exceedingly rare, so rare that it is impossible to say that a permanent resident alien's potential deportability poses any obstacle to his employment. In 1975, some 4.2 million aliens were permanent residents of the United States. *1975 Annual Report of the Immigration and Naturalization Service* 112. During the year, only 1,716 aliens who had entered the country with such an "immigrant" status were deported or required to leave the country. Id. at 98. See also *Sugarman v. Dougall, supra,* 413 U.S. at 645, 93 S.Ct. 2842.

The majority's reference to the Selective Service laws seemingly to suggest a Congressional judgment that permanent resident aliens may pose security problems—is also misguided. The provision cited, 31 C.F.R. § 1611.2(a), excludes from the draft only aliens temporarily present in the United States: diplomats, students, business or pleasure travelers, and the like. See *id.*; 8 U.S.C. § 1101(a)(15). The permanent resident aliens who are the plaintiff class in this case are subject to the draft to the same extent as citizens, see 50 U.S.C. App. § 453; 31 C.F.R. § 1611.1(a)(2), (3), (4); *Sugarman v. Dougall, supra,* 413 U.S. at 645, 93 S.Ct. 2842, which suggests that Congress does not perceive the same security risks from the aliens involved here that is suggested by the majority. The status of enemy aliens in wartime mentioned by the majority is simply irrelevant to this case. If hostile relations existed between the United States and a particular alien's country of nationality, this could be taken into account as part of the "individualized determination" of the alien's eligibility for employment permitted by *Sugarman v. Dougall, supra,* 413 U.S. at 646–47, 93 S.Ct. 2842. See *In re Griffiths, supra,* 413 U.S. at 722 n. 11, 93 S.Ct. 2851. But the statute presently under review does not limit the disability of permanent resident aliens to those unusual situations where a conflict of loyalties might conceivably exist. Rather, it bars *all* resident aliens from the state police, including those who have immigrated to the United States from countries which have long enjoyed the most cordial relations with this nation. We may, for instance, take judicial notice that the possibility of a war between the United States and Ireland (the homeland of the named plaintiff) is exceedingly slim.

Finally, by noting that aliens may "claim the diplomatic protection" of their country of nationality, the majority seemingly seeks to imply that they would somehow be immune from dismissal for improper performance of their duties as policemen. Nothing, of course, could be further from the truth. The "diplomatic protection" involved is merely a foreign consulate's inquiry into a situation involving one of its nationals, not the immunity from prosecution reserved for accredited diplomats. Aliens, other than accredited diplomats, are regularly prosecuted if they break the laws, and would

similarly be subject to dismissal from their police posts on proper grounds.

No doubt there are some resident aliens whose backgrounds might reasonably create doubt as to their dedication to the laws of the State, just as there are citizens whose backgrounds would provide similar suspicions. Under authority provided by the state legislature, see N.Y. Exec. Law § 215(3), Superintendent Connelie of the State Police already employs selection procedures to weed out citizen applicants who appear unsuitable for police work. These same selection and training procedures, applied equally to all applicants, would provide the State with the means of assuring that only those aliens whose loyalty and suitability for police work were not questionable would become members of the State Police force.[3] Such a case-by-case determination of the qualifications of particular applicants, as opposed to the flat ban on noncitizens now employed by the State, was implicitly approved by the Supreme Court in *Sugarman v. Dougall, supra,* 413 U.S. at 646–47, 93 S.Ct. at 2850:

"[W]e do not hold that, *on the basis of an individualized determination,* an alien may not be refused, or discharged from, public employment, even on the basis of

noncitizenship, if the refusal to hire, or the discharge, rests on legitimate state interests that relate to qualifications for a particular position or to the characteristics of the employee." (Emphasis added)

Once on the State Police force, a noncitizen trooper would, of course, be subject to the same chain of command and disciplinary sanctions as his citizen counterparts to assure that he faithfully performed his duties. The fact that requirements of citizenship for policemen, while not uncommon, are hardly universal among the states underlines the conclusion that such individual evaluations of noncitizen applicants and the normal discipline of State Police are likely to fully protect the State's interest in having a loyal and diligent State Police force.[4]

---

**3.** The fact that the applicant for the State Police must undergo background checks and rigorous selection procedures distinguishes this case from *United States v. Gordon-Nikkar,* 518 F.2d 972 (5th Cir. 1975), and *Perkins v. Smith,* 370 F.Supp. 134 (D.Md.1974), *appeal docketed,* 426 U.S. 913, 96 S.Ct. 2616, 49 L.Ed.2d 368 (1974), where the courts upheld citizenship requirements for jurors. Given the fact the jurors must, of necessity, be selected through rather expedited procedures, the only method the State has of safeguarding its interest in having jurors with demonstrated knowledge of and dedication to the laws they are to apply is by relying on the naturalization procedures. There is no reason to believe, however, that the State Police selection procedures would be less effective than the naturalization procedures in determining if a given noncitizen applicant understands and is likely to support faithfully the laws of the nation and the State, insofar as this can ever be determined through such procedures.

**4.** Besides New York 23 states have statutory requirements of citizenship for members of the

State Police. See, e. g., Ariz.Rev.Stat.Ann. § 38–201; Mich.Stat.Ann. § 4.434; R.I.Gen. Laws § 42–28–28 (1956). Twenty-six states, e. g., California, Maryland, and Wisconsin, have no apparent statutory citizenship requirement, although some of these states may have established such a requirement through rule or regulation. A spot survey conducted by the Federal Bureau of Investigation at the request of this court indicated that citizenship was required by the majority of the police agencies surveyed, although *not* by the California State Highway Patrol, and the police departments of Boston, Mass. and New Haven, Conn. At the least, this data indicates that the importance of citizenship requirements for policemen is subject to different appraisals in various states and localities. Given the heavy burden of proof resting on New York in this case, the fact that a number of police agencies forego such citizenship requirements without apparent injury to their interests casts considerable doubt on the necessity for, and thus the constitutionality of, the requirement.