**UNITED STATES of America,**
**Appellee,**

v.

**Gloria PADGENT, Appellant.**

**No. 701, Docket 33853.**

United States Court of Appeals,
Second Circuit.

Argued April 8, 1970.

Decided Oct. 15, 1970.

---

Jerome C. Ditore, Asst. U. S. Atty., Edward R. Neaher, U. S. Atty., for appellee.

Joseph J. Marcheso, David S. Wallenstein, New York City, for appellant.

Before WATERMAN and FRIENDLY, Circuit Judges, and ZAMPANO, District Judge.**

WATERMAN, Circuit Judge:

Appellant Gloria Padgent appeals from a judgment of conviction, rendered after a jury trial. She was found to have passed four five-dollar counterfeit bills in violation of 18 U.S.C. §§ 472 and 2.[1] The sole issue she raises on this appeal is whether the trial court committed reversible error by a ruling which curtailed defense counsel's attempted impeachment of appellant's alleged accomplice who testified as a government witness. We hold reversible error was committed and, accordingly, we reverse and remand for a new trial.

The success of the Government's case depended upon a favorable resolution of the factual issue of whether appellant had "guilty knowledge" that she was involved in the passing of counterfeit money. On the basis of the evidence at trial, the jury could have found that on the evening of December 15, 1967, appellant and a friend, Carol Daniels, who was then residing at appellant's apartment, met with another mutual friend, Vernon Seymour, and drove to a bar in Queens called the Hat Box Lounge. While Seymour remained in his car, a Thunderbird, the two women entered the bar and ordered drinks, each paying for her own with a five-dollar bill. Before

** Of the District of Connecticut, sitting by designation.

1. 18 U.S.C. § 472 reads in pertinent part as follows:

> *Uttering counterfeit obligations or securities.*
>
> Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell * * * any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined not more than $5,000 or imprisoned not more than fifteen years, or both.

Appellant had been charged with two codefendants, Carol Daniels and Vernon Seymour, in a four-count indictment for passing, possessing, transferring and delivering counterfeit money. Carol Daniels pleaded guilty before trial, and Vernon Seymour's case was severed from appellant's. The third and fourth counts relating to possession, transfer and delivery were dismissed at the close of the Government's case. The jury acquitted appellant on the second count. Following the judgment of conviction on the first count appellant was sentenced to one year in prison.

Vernon Seymour was convicted and this conviction was recently affirmed at argument by another panel of this court.

leaving the bar about fifteen minutes after their arrival, the bartender changed two additional five-dollar bills upon the representation that the women needed the change for use in a poker game. Previous to these last transactions, Officer Burke, an off-duty policeman who was a patron of the Hat Box Lounge while the two women were there, was also asked by Miss Daniels to change a bill, but he could not oblige her.

After the women left, Officer Burke, acting upon suspicion, asked the bartender to let him inspect the fives the two women had passed. He discovered that the serial numbers were identical, concluded that the bills were counterfeit, and informed the bartender. The bartender then went to the door and, observing that the women were entering Seymour's car, closed the bar and drove with Officer Burke in the direction that Seymour's car had taken. A short drive away the pursuers spotted the Thunderbird parked in front of Flash's Lounge. As at the Hat Box, Seymour had remained in the car while the women went into Flash's. The authorities were quickly notified, and appellant, Miss Daniels, and Mr. Seymour were arrested shortly thereafter. Four five-dollar counterfeit bills were passed in Flash's Lounge. The bills passed in the Hat Box and Flash's Lounge, eight in all, were the only counterfeit bills found by the authorities.

Miss Daniels testified that the evening's episode began with a telephone call from Seymour to appellant at appellant's apartment informing her that he was coming over with some counterfeit money. The two women agreed to help him dispose of it and Seymour picked them up and drove them to the Hat Box Lounge. Her testimony was that appellant received the bills from Seymour, hid them in her brassiere, doled a few fives out to Daniels at a time, and each of them passed two of the bills in the Hat Box Lounge and two more in Flash's Lounge.

Appellant took the stand on her own behalf. She testified that Miss Daniels convinced her to go out for the evening, and, as appellant was short of cash, Miss Daniels agreed to pay for everything. Although Miss Daniels had agreed to pay for the evening, appellant called Seymour, a mutual friend of both women, in order to borrow some money. They met Seymour on the way to the Hat Box Lounge where he lent them money. Appellant's testimony was that Miss Daniels paid for the drinks at the Hat Box Lounge, but appellant picked up the four singles, the change for her own drink. They then went to Flash's Lounge where Miss Daniels again paid for the drinks. Appellant denied having any knowledge that any of the money was counterfeit until told that it was by the police and secret service agents after her arrest.

Officer Burke and the bartender testified as to the women's actions in the Hat Box Lounge but there was no testimony other than that of appellant and Miss Daniels as to their activities in Flash's Lounge. Appellant was found guilty on the count charging the passing of counterfeit bills at the Hat Box Lounge and was acquitted on the count relating to Flash's Lounge.

As can be readily seen, there was a direct conflict in the testimony as to appellant's *mens rea;* Miss Daniels testified that appellant had full knowledge of what she was doing and intended to do it, while appellant testified that she was an innocent victim of circumstances. As evidenced by the verdict of guilty returned on the first count, the jury must not have completely disbelieved Miss Daniels' testimony. On the other hand, the acquittal on the second count indicates that the jury must have harbored some doubts about the story she told.

Inasmuch as Miss Daniels was appellant's alleged accomplice and had been charged as a codefendant in the indictment, defense counsel naturally inquired on cross-examination into the circumstances which motivated her to testify on behalf of the Government. In response to counsel's questions Miss Daniels revealed that she had pleaded guilty three days prior to the commencement

of appellant's trial, but she denied discussing her decision so to plead with her own attorney or with the prosecuting attorney except to notify them that she intended to do so and intended to testify for the Government. She further testified that no comments were made to her about her intentions by any of the attorneys involved in the case. At one point during her cross-examination defense counsel asked:

Q. Miss Daniels, you are still on bail, are you not? A. Yes.

Q. You are on bail in connection with this case? A. Yes.

Q. How much bail are you out on? A. I was let out on my own custody.

Q. When you were released in your own custody, were you told you had to stay in the Eastern District of New York or Long Island or Staten Island? A. Yes.

Q. Did you stay in the Eastern District of New York?

At this point the prosecutor objected and the following discussion occurred at a sidebar conference out of the hearing of the jury:

Mr. Stillman [prosecutor]: Mr. Chrein [defense counsel] is obviously going to question her about possibly some illegal activity that she performed. There have been no charges brought against her. She was never arrested for bail-jumping. There was never a warrant.

\* \* \* \* \* \*

Mr. Chrein: The Jury would have a right to know if this Witness has a motive to testify as she does. She has been released on bail and violated the terms of her bail and her bail is still standing. I think the Jury should know that.

The Court: All right. Objection sustained.

The Government's brief on appeal in this case aptly frames the purpose of defense counsel's line of questioning.

Appellant's whole argument on this appeal is based on the premise that if appellant was permitted to ask Miss Daniels if she jumped bail, and if Miss Daniels said she had, and if Miss Daniels had not been indicted for that offense, the jury could have concluded that Miss Daniels was rewarded for her testimony and therefore her testimony was false and unbelievable \* \* \*.

In the light of appellant's version of the facts as she related them on the stand, there is no doubt that this is exactly what defense counsel wished the jury to believe about Miss Daniels' testimony.

The Government contends that the court did not abuse its discretion in sustaining the objection, because there was, and is, no evidence in the record that Miss Daniels had violated her bail restrictions, much less been rewarded by not being indicted for bail jumping. It seems to us, however, that defense counsel made an adequate offer of proof and, from what we learned at the oral argument in this case, that counsel had a basis for believing that Miss Daniels had not been faithful to her bail requirements and that the Government, knowing this, had taken no steps to punish her. As to the latter, the Government admitted as much to the trial judge while discussing the government objection to counsel's questions.

An accomplice's testimony implicating a defendant as a perpetrator of a crime is inherently suspect for such a witness may well have an important personal stake in the outcome of the trial. An accomplice so testifying may believe that the defendant's acquittal will vitiate expected rewards that may have been either explicitly or implicitly promised him in return for his plea of guilty and his testimony. As stated in United States v. Masino, 275 F.2d 129, 132, 133 (2 Cir. 1960):

When a witness in a criminal case is being questioned as to his possible motives for testifying falsely wide latitude should be allowed in cross-examination. \* \* \*

* * * * * *

Indeed, where the principal witnesses appearing in behalf of the prosecution * * * have engaged in illegal practices and are accomplices to the crime charged, it is essential to a fair trial that the court allow the defendant to cross-examine such witnesses as widely as the rules of evidence permit. * * *

In *Masino* the defendant was not permitted to examine two prosecution witnesses as to alleged "rewards" provided them by the Government prior to their testimony. One witness, a government informant, was a former narcotics user; the other witness was defendant's alleged accomplice. Our court held it to be substantial error to restrict cross-examination aimed at uncovering prior misconduct and at showing lenient treatment by government officials prior to pro-prosecution testimony at defendant's trial See also Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931); United States v. Lester, 248 F.2d 329, 334–335 (2 Cir. 1957); Meeks v. United States, 163 F.2d 598, 11 Alaska 378 (9 Cir. 1947); McCormick, Evidence 82 (1954); 3 Wigmore, Evidence § 967 (3d ed. 1940).

Here the accomplice, Miss Daniels, had reason, in addition to the fact that sentence had not yet been imposed upon her for her complicity in the passing of the counterfeit bills, to make sure that her testimony did not disappoint the prosecution. Having "jumped" bail, she was vulnerable to an indictment for having done so, and she may have wondered about what action the Government might take against her if, after she testified on behalf of the prosecution, defendant Padgent was not convicted. Appellant was substantially prejudiced by the exclusionary ruling, for revelation of the facts concerning Miss Daniels' violation of her bail restrictions, and an argument

to the jury based thereon, may well have affected the jury's evaluation [2] of Miss Daniels' assertions that appellant knowingly participated in passing counterfeit money.

Reversed and remanded for a new trial.

---

2. As noted above, the verdict of guilty on one count and the verdict of acquittal on the other indicate that the jury, even without the impeachment successfully excluded from their hearing, was not wholly at ease with Miss Daniels' testimony. While we do not speculate on the exact consequence of the error below, we find it reasonably likely that the error may have affected the jury's decision.