UNITED STATES of America, Appellee,

v.

Vincent Austain TONER, Colm Murphy, Appellants.

Nos. 416, 417, Dockets 83–1287, 83–1294.

United States Court of Appeals, Second Circuit.

Argued Nov. 16, 1983.

Decided Feb. 14, 1984.

John R. Wing, New York City (Jacqueline C. Wolff, Weil, Gotshal & Manges, New York City, of counsel), for defendant-appellant Colm Murphy.

David L. Lewis, Lewis & Fiori, New York City, for defendant-appellant Vincent Austain Toner.

Peter Chavkin, Asst. U.S. Atty., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., E.D.N.Y., Allyne R. Ross, Asst. U.S. Atty., Brooklyn, N.Y., on brief), for plaintiff-appellee.

Before OAKES and MESKILL, Circuit Judges, and NEAHER, District Judge.*

OAKES, Circuit Judge:

Colm Murphy and Vincent Toner appeal from convictions arising out of Murphy's purchase from an undercover FBI agent of twenty M–16 machine guns which the appellants planned to transport to Northern Ireland. Both Murphy and Toner were indicted for and convicted of three rather technical firearms offenses. Count One charged that the men received and possessed the machine guns unlawfully in that no written application was on file with the Secretary of the Treasury when the guns

---

* Of the Eastern District of New York, sitting by designation.

were transferred to them.[1] Count Two charged Murphy and Toner with receipt and possession of guns not registered to either of them in the National Firearms Registration and Transfer Record.[2] The third count charged the two men with conspiring to commit the foregoing offenses; the overt acts alleged were Murphy's purchase of the guns on July 21, 1982, and Toner's loading of them into the car that he was driving at that time. Murphy, who is a citizen of Northern Ireland, was also convicted of a fourth charge, that of being an illegal alien who received and possessed guns.[3]

Trial was by jury in the United States District Court for the Eastern District of New York, Thomas J. Platt, Judge. Murphy received a sentence of concurrent terms of five years imprisonment on the first three charges, a concurrent term of two years imprisonment on the alien charge, and a fine of $10,000. Toner received a sentence of concurrent terms of 18 months imprisonment on his three charges and a fine of $7,500. In this shotgun type appeal, appellants, who are represented by separate counsel, raise a host of points which may be roughly grouped under eight headings. Finding none of them meritorious, we affirm.

## FACTS

In March, 1982, Colm Murphy was introduced to Sydney Kail, an FBI informant, at a Manhattan bar. Murphy told Kail that he was a member of the Irish National Liberation Army (INLA) interested in buying heavy military equipment. Murphy mentioned missiles, mortars and machine guns. Kail explained that he did not sell weapons, that he was only a middleman who would take Murphy to meet his "partner," a member of the Mafia who dealt in guns and arms. This "Mafia contact" was in fact Lindley DeVecchio, an FBI undercover agent with considerable experience in weapons.

On April 21, 1982, Murphy, Kail and DeVecchio met in the latter's FBI undercover car. A tape recorder was running. Murphy again stated his need to buy weapons, particularly heavy military equipment such as SAM–7 missiles or "something that is, has the capability of taking down ah a helicopter." When DeVecchio explained that he could not procure such items, the discussion turned to M–16 machine guns and Ingrams, which are small, hand-held submachine guns. Murphy explained that he was interested in developing a weapons "connection" on the East Coast and stated that if he got a "decent deal" he would "be back with $180,000." The M–16s were for use "on the streets of Belfast . . . ."

Murphy and Agent DeVecchio met for the second time on June 2, 1983. Again, the meeting was in the agent's car, and again, a tape recorder was running as Murphy talked about his past purchases of arms and his need to do a "good faith" deal with DeVecchio. Murphy indicated an interest in a variety of weapons, but emphasized his need for M–16s. At a third meeting, about a month later, Murphy said "I need a deal and I guarantee ya I'll take everything you have once I can see the deal."

It was during this third meeting that Murphy and DeVecchio struck a deal. Murphy would buy twenty M–16 machine guns for $11,000. Murphy suggested Astoria, Queens, as the place where the actual delivery would occur, and traveler's checks as the payment medium. He indicated that he would have another person with him driving the car. Murphy and DeVecchio then drove to Astoria to choose the location, Murphy on the way stating to DeVecchio that he was an illegal alien. Murphy chose a MacDonald's restaurant as the site for the transaction. The evening of July 21, 1982

---

1. Count One of the indictment charged that the failure to comply with 26 U.S.C. § 5812 (1976) resulted in violations of 26 U.S.C. §§ 5861(b), 5871 (1976) and 18 U.S.C. § 2 (1976).

2. Count Two of the indictment charged that the failure to comply with 26 U.S.C. § 5841 (1976) resulted in violations of 26 U.S.C. §§ 5861(d), 5871 and 18 U.S.C. § 2.

3. 18 U.S.C.App. § 1202(a) (1976).

was set for the fourth meeting when delivery would be made.

On July 21, 1982, DeVecchio met Murphy at the Queens MacDonald's. Over a dozen FBI agents were in surveillance, one of whom, Special Agent Bruce Stephens, was posing as a Mafia body guard. The twenty machine guns were packed in boxes under the hatch trunk of DeVecchio's car. Before the deal could be consummated, however, Murphy saw what he thought were police in the vicinity,[4] and he moved the deal to a White Castle restaurant a few blocks away on Queens Boulevard. When DeVecchio and Stephens arrived there, Murphy introduced Toner as the man he had brought along to inspect the guns, and Toner then went to DeVecchio's car to count, inspect and load the M–16s into the car he had borrowed for the evening. Toner also took a package from the wheel well of his car from which Murphy extracted several thousand dollars in cash and traveler's checks. Murphy then paid DeVecchio, and Toner drove off.

Murphy was arrested as he signed over his last travelers' check. Toner was arrested after he had driven half a block with the guns inside his car.

4. The "police" that prompted Murphy's concern were in fact two undercover FBI agents who were part of the surveillance team but who spent most of their evening apprehending a man who tried to steal their undercover van. *Sic transit metropolis.*

5. Murphy's brief states that "[i]n order to sustain Count 1, the government was required to prove beyond a reasonable doubt that no written application was on file with the Secretary of the Treasury as required by U.S.C. §§ 5812, 5841." In fact, contrary to counsel's suggestion, it was Count Two, and not Count One, that alleged a violation of section 5841. Count One, of course, charged failure to comply with section 5812.

The two sections are closely related, however. As Judge Platt indicated at trial, there is some "overlap" between sections 5812 and 5841. Perhaps the strongest argument that appellants might have made to this court—one which they did *not* make—is that Counts One and Two are multiplicitous in that they charge the same offense in distinct counts. As we said in *United States v. Reed,* 639 F.2d 896, 903 (2d Cir.1981), "[t]he vice in multiplicity of charges

## DISCUSSION

### Introduction

Neither Murphy nor Toner argues overall insufficiency of the evidence. Murphy does maintain that the government failed to prove in connection with Count One that no written application was on file with the Secretary of the Treasury as required by 26 U.S.C. §§ 5812 and 5841.[5] Both Murphy and Toner claim they were denied a fair trial. Murphy's fair trial argument specifically points to the court's (1) denial of his alleged right to call one Michael Hanratty as a witness, (2) imposition of "unconstitutional" restriction on Murphy's cross-examination of the informant Kail and Agent DeVecchio, (3) denial of Murphy's alleged right to assert a so-called "post traumatic stress disorder" defense and (4) exclusion of evidence pertaining to Murphy's "susceptibility" to the FBI initiated inducements to purchase arms for the INLA cause. Toner's unfair trial claim is in two parts, one specific and one general. His specific allegation is that the court's charge to the jury on the key element of possession deprived him of a fair trial and an impartial jury. The general claim is that the trial court, in

is that it may lead to multiple sentences for the same offense and may improperly prejudice a jury by suggesting that a defendant has committed not one but several crimes." *See also Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

We do not suggest that Counts One and Two were or were not multiplicitous. Not only did appellants fail to raise the issue before trial, as required by Fed.R.Crim.P. 12(b)(2), but they have also failed to raise the issue to us on appeal. The question has not, of course, been briefed by the government. We note in passing, however, that Murphy and Toner received concurrent sentences for Counts One and Two, and thus, even if the counts were multiplicitous, the multiplicity did not result in enhanced punishment. *But cf. United States v. Vargas,* 615 F.2d 952, 959–60 (2d Cir.1980) ("concurrent sentence" doctrine will not apply in Second Circuit unless government meets burden of showing risk of collateral consequences not substantial). In addition, given the overwhelming evidence of appellants' guilt, it would be somewhat ludicrous to suggest that the jury might have been unduly prejudiced by the multiplicity.

action and words, denied both appellants a fair trial by the appearance of partiality; in pressing this argument, some of the points urged by Murphy are relied upon.

Both Murphy and Toner also argue that the court's charge on entrapment was improper. Murphy maintains that it did not refer to his knowledge that the guns were unregistered, that there was no transfer application on file or even that there was a registration requirement, while Toner complains that the court improperly declined to charge entrapment as to him.

Both appellants allege violations of due process. Murphy argues the impropriety of the government enticing appellants to commit regulatory offenses; Toner refers to "excessive governmental inducement." Murphy also argues that he never had possession of the firearms, and that he is therefore entitled to dismissal of all the substantive counts, though not of the conspiracy count. He also argues that 18 U.S.C.App. § 1202(a)(5), the offense charged in Count Four, unconstitutionally contravenes the equal protection rights of illegal aliens. Toner argues that the failure to grant him a severance was reversible error in light of the highly prejudicial tape recordings of Murphy's conversations with DeVecchio. He also argues that the statutory exclusion of aliens from the jury venire is violative of both his and Murphy's Sixth and Fifth Amendment rights. We will discuss each of these contentions in the order set forth above.

*I. Proof Regarding Count I.*

Murphy argues that the government failed to meet its burden of proof on Count One. He claims that the government did not prove beyond a reasonable doubt that no written application was on file with the Secretary of the Treasury as required by 26 U.S.C. § 5812.[6] Murphy concedes, of course, that the government obtained a certificate from the Custodian of the National Firearms Registration and Transfer Record that "after diligent search of said record, [she] found no record that [any firearm] is registered to or has been acquired by lawful making, transfer or importation by Colm Murphy also known as Michael Colm Murphy," but he argues that this type of certification will not suffice to establish that there is no *pending* application on file with the Secretary of the Treasury. Rather, all that it establishes is that there is no *approved* application on file with the Secretary of Treasury. *United States v. Stout*, 667 F.2d 1347, 1352 (11th Cir.1982) ("firearms registry does not constitute, as required by Fed.R.Evid. 803(10), a 'regularly made and preserved record' of . . . pending applications for firearm transactions . . .").

■ Appellants are correct that the Custodian of Records cannot know whether a pending transfer application is on file. However, the charges underlying Count One require that people not receive firearms without a lawful transfer, and it is perfectly clear that a lawful transfer cannot occur unless an *approved* application is on file. The statute is unambiguous.

**6.** § 5812. Transfers

(a) Application

A firearm shall not be transferred unless (1) the transferor of the firearm has filed with the Secretary a written application, in duplicate, for the transfer and registration of the firearm to the transferee on the application form prescribed by the Secretary; (2) any tax payable on the transfer is paid as evidenced by the proper stamp affixed to the original application form; (3) the transferee is identified in the application form in such manner as the Secretary may by regulations prescribe, except that, if such person is an individual, the identification must include his fingerprints and his photograph; (4) the transferor of the firearm is identified in the application form in such manner as the Secretary may by regulations prescribe; (5) the firearm is identified in the application form in such manner as the Secretary may by regulations prescribe; and (6) the application form shows that the Secretary has approved the transfer and the registration of the firearm to the transferee. Applications shall be denied if the transfer, receipt, or possession of the firearm would place the transferee in violation of law.

(b) Transfer of possession

The transferee of a firearm shall not take possession of the firearm unless the Secretary has approved the transfer and registration of the firearm to the transferee as required by subsection (a) of this section.

Therefore the Custodian's inability to account for pending applications is irrelevant in this case. Unlike *Stout,* the certificates here do not specify that Murphy and Toner failed to file an application, but only that the guns were not obtained by lawful transfer. This was made clear in the court's charge to the jury. *Cf. United States v. Mayo,* 705 F.2d 62, 76 n. 10 (2d Cir.1983) (accepting similar certificate as evidence of unlawful possession).

## II. *Fairness of the Trial.*

Murphy makes four specific arguments which are said to demonstrate the unfairness of his trial.

1. Murphy first urges that he should have been permitted to call FBI informant Michael Hanratty as a witness to testify that Murphy had twice rejected Hanratty's proposals to engage in an arms deal. On two occasions, Hanratty, evidently playing a role similar to Kail's, suggested to Murphy that he had a friend who was an arms dealer and who would probably be able to supply Murphy with a variety of arms. The two men arranged for Murphy to recontact Hanratty to set up a meeting, but no meeting took place because Murphy did not recontact Hanratty. Later Hanratty outlined to Murphy a scenario whereby the arms dealer would meet with Murphy in New Orleans and even pay Murphy's expenses while in New Orleans, but Murphy again, after accepting the invitation, telephoned to say that he would rather not go.

■ Murphy's contention is that this evidence demonstrates that he was not predisposed to commit the crimes for which he was convicted, and that Judge Platt should have allowed him to examine Hanratty on that issue. We do not agree. The trial court did not abuse its discretion in precluding the evidence under Fed.R.Evid. 403 because Murphy's contacts with Hanratty were simply not probative of Murphy's predisposition. On the contrary, at the pretrial hearing at which the question of Murphy's contacts with Hanratty was explored, it was disclosed that the reason Murphy could not meet the arms dealer was because Murphy's funds had not arrived and he did not "want to embarrass him[self] or the cause." As we view this evidence, it only confirms Murphy's desire to purchase guns since it involves statements of his commitment to the cause of "Irish National Liberation" and reiterates his desire to obtain weapons. As the government states, it was the lack of funds, not the lack of desire that caused Murphy to decline Hanratty's invitations. In addition, Murphy was at the very same time dealing with Kail, whom he thought to be another potential arms supplier. The whole question could well have served to confuse the jury. *See United States v. Bowe,* 360 F.2d 1, 15–16 (2d Cir.), *cert. denied,* 385 U.S. 961, 87 S.Ct. 401, 17 L.Ed.2d 306 (1966). This case is entirely different from the case relied on by Murphy, *United States v. Goodwin,* 625 F.2d 693 (5th Cir.1980), where the defendant was precluded from calling an important character witness.

2. In the course of a lengthy cross-examination of the FBI informant Kail, certain government objections were sustained by the court which Murphy argues severely restricted his right to cross-examine the witness. These restrictions primarily involved cross-examination as to an unlicensed handgun which Kail at one time possessed, Kail's financial arrangements with the FBI, his original association with the FBI, and his arrests (but not convictions) in 1953 and 1973. In addition, defense counsel wished to recall Kail after he had been excused from the stand to ask more questions about payments Kail had received from the FBI. Judge Platt refused to permit Kail to be recalled, allegedly preventing Murphy from impeaching the witnesses' credibility.

■ All of these allegations are without merit. Counsel did establish on cross-examination that Kail had acquired a gun without a license, that Kail knew it was illegal to carry a gun in the City of New York without a license and that Kail had given perjurious testimony in this very trial, when he claimed that he had been stopped carrying a cap gun, rather than a derringer.

Counsel was also permitted to ask Kail whether, when he was arrested by the police, the FBI arranged to "drop the whole thing" and Kail answered the question negatively twice. There was additional testimony elicited on cross about the date of his ownership and possession of the gun. Limiting further inquiry as to the gun was not an abuse of the court's discretion.

■ Appellant Murphy also contends that the trial court improperly limited cross-examination as to the amount of money that Kail received from the FBI. Kail testified that the payment of $5,000 to him by the FBI "could be from the other things I was doing in 1982" and claimed he was told the payment was for expenses. The court limited detailed examination by defense counsel having to do with the payment of an additional $500 to Kail two or three days after his first meeting with Murphy. Counsel's notion was to explore a supposed inconsistency between the record summary sheet of payments provided by the government and Kail's testimony. But Kail admitted on the stand that he had received over $5,000 for his "IRA work" and it was clear that he was not always told why he received certain monies. That Kail was a paid informer could hardly have been more clear. As noted above, it was also established that Kail was not the most saintly of men and that he had lied on the stand. Defense counsel was making the same point over and over. Thus, to limit this line of cross-examination was well within the discretion of the court.

■ In addition, the court properly barred inquiry into Kail's reasons for first coming to the FBI, since such inquiry apparently would have jeopardized other ongoing FBI investigations. See Fed.R.Evid. 402 and 611; United States v. Young, 655 F.2d 624, 626 (5th Cir.1981). As to Kail's 1953 arrest for grand larceny and his 1973 arrest for forgery and possession of stolen property, both matters would have been excludable under Fed.R.Evid. 609, had they resulted in convictions, because they antedated the ten year time limit set forth in that rule; as "mere" arrests, it was clearly

appropriate for the court to exclude the evidence. Moreover, appellants were permitted to question Kail about his 1978 larceny conviction, his failure to file his tax returns and his lying on the witness stand in reference to the gun. In sum, the court did not abuse its discretion.

Murphy argues that the court imposed severe restrictions on his cross-examination of Agent DeVecchio "on key issues." Specifically, counsel sought to cross-examine the agent concerning the fact that he and the FBI were the only ones empowered to file an application for the registration of the firearms sold to the transferee. Murphy argues that this line of cross-examination would be relevant with respect to DeVecchio's credibility and to the question whether DeVecchio was biased. See United States v. Mayo, 498 F.2d 713 at 716 (D.C. Cir.1974). Murphy also complains that counsel was improperly interrupted when establishing that DeVecchio lied to Murphy about his identity in the course of their dealings, and was thus not a credible witness. See United States v. Padgent, 432 F.2d 701, 705 (2d Cir.1970).

■ This line of argument is absurd. As the court below observed, Agent DeVecchio was "role playing" rather than lying when he did not tell Murphy that he was an FBI agent or that the guns were owned by the Navy. Padgent is thus utterly inapposite. Nor was the government required to register the guns in this undercover operation. United States v. Khatib, 706 F.2d 213, 216 (7th Cir.1983). Thus, Agent DeVecchio's "failure" to do so had absolutely no bearing on either his credibility or character. In addition, the fact that only the government agents could register these guns does not help Murphy, since it is well established that the transferee has an affirmative duty to ensure that firearms are properly registered before taking possession. Khatib, 706 F.2d at 216.

■ 3. Murphy argues that the court refused him the right to present an insanity type defense to the effect that he was suffering from "post traumatic stress disorder"

(PTSD), a condition which used to be known as "shell shock" or "battle fatigue." Murphy's disorder is said to be a result of the prolonged combat in Northern Ireland, including his participation in hunger strikes. But it was not until May 2, 1983, the date on which trial was to begin, that Murphy moved for an adjournment in order to explore this defense, which was suggested by a doctor who stated that his "preliminary impression" was that there was a "strong possibility" that Murphy had PTSD and that this condition "may be" causally related to the crimes allegedly committed. The court denied the adjournment because Murphy had not shown "good cause" for the late filing of his notice of a defense based on mental condition as required by Fed.R. Crim.P. 12.2.[7] Murphy had already been incarcerated for approximately ten months. The original trial date had been repeatedly postponed at the request of defense counsel. The two month adjournment sought by Murphy was to explore the "possibility" that he might suffer from PTSD and that the disorder "may" have caused him to commit the crimes charged. The court's refusal to permit the additional delay was clearly correct. *Ronson v. Commissioner,* 604 F.2d 176, 179 (2d Cir.1979), relied upon by Murphy, is distinguishable because there the government was on notice of defendant's intention to use an insanity defense as a result of the defendant's prior attempt to interpose one at an earlier mistrial. In *Ronson* we found substantial compliance with the notice requirements of Rule 12.2. Here there was no compliance whatsoever.

4. Murphy also complains that the exclusion of evidence bearing on his susceptibility to the FBI initiated inducements to purchase arms for the "cause" against the British denied him a fair trial. Murphy called a number of witnesses to testify about his awareness of various abuses, beatings, bombings, threats and torture inflicted on members of his own family by British soldiers in Northern Ireland and sought to adduce facts involving his participation in hunger strikes and other protest activities.

[11] The evidence was properly excluded. It was relevant to the issue of inducement only insofar as it could be shown that the agents working on behalf of the FBI knew of that susceptibility. No evidence of such knowledge was proffered. The only issue as to which this evidence regarding the "troubles" was possibly relevant was Murphy's predisposition, and rather than show a lack of predisposition, the evidence goes to show an even greater predisposition to commit the crimes charged, since Murphy concededly was an avid believer in the Irish nationalist cause. In any event, evidence regarding the Irish conflict would have been very apt to confuse and mislead the jury. It was excludable for this reason alone. Fed.R.Evid. 403. *See United States v. Bowe,* 360 F.2d at 15. This was not a trial as to who was, or is, right or wrong in the dispute in Northern Ireland, but rather as to whether the appellants knowingly possessed unregistered guns. *Cf. United States v. Thompson,* 710 F.2d 915, 920–21 (2d Cir.1983) (evidence excluded because barely probative and in any event would have generated a trial within a trial), *cert. den.,* —— U.S. ——, 104 S.Ct. 702, 79 L.Ed.2d 167 (1983).

Turning to Toner's contentions relative to deprivation of a fair trial, he argues specifically that the charge to the jury on the key element of possession was erroneous. The argument is that the charge, a portion of which is set forth in the

---

7. Rule 12.2. Notice of Defense Based upon Mental Condition
 (a) Defense of Insanity. If a defendant intends to rely upon the defense of insanity at the time of the alleged crime, he shall, within the time provided for the filing of pretrial motions or at such later time as the court may direct, notify the attorney for the government in writing of such intention and file a copy of such notice with the clerk. If there is a failure to comply with the requirements of this subdivision, insanity may not be raised as a defense. The court may for cause shown allow late filing of the notice or grant additional time to the parties to prepare for trial or make such other order as may be appropriate.

margin,[8] amounted to a "directed verdict" on the issue of possession, since it allegedly equated knowing possession with "mere" possession by mistake, accident or inadvertence. But the challenged instruction must be examined in the context of the charge as a whole. *See United States v. Scacchetti,* 668 F.2d 643, 648 (2d Cir.), *cert. denied,* 457 U.S. 1132, 102 S.Ct. 2957, 73 L.Ed.2d 1349 (1982). When Judge Platt's charge is so examined, it is clear that he was very careful to separate the elements of possession and knowledge and that he carefully emphasized at several times that the government had to prove knowing possession. The hypothetical that the court provided drew a distinction between actual possession and constructive possession when property is initially in the hands of another. The point that the court was making is that it did not matter how long possession—actual, joint or constructive—continued, the crime was complete when the transfer occurred, irrespective of whether the FBI agents had Toner's car surrounded. Read in this context the court's charge was proper. Moreover, even had there been some damage done in the court's supplemental charge—and we do not think any was—it was certainly cured by the court's reemphasis to the jury of the necessity of finding knowledgeable possession, which meant finding that Toner knew what was in the car and in the boxes. Of course the court included the usual instruction to the effect that the jury was the factfinder and that it was to disregard the court's hypotheticals since they were not evidence.

Toner also attacks broadly the judge's handling of the trial as being unfair and partial. The impropriety is said to have included derisive comments concerning the conduct of defense counsel and the strength of defendants' case. Judge Platt is alleged to have consistently demeaned defense counsel, defense witnesses and defense requests in the presence of the jury, while permitting the prosecution witnesses "to literally say anything harmful to the defendants." Ten pages of Toner's brief is devoted to making these and similar points, along with citations to the leading cases in this circuit. Among others, Toner cites *United States v. Nazzaro,* 472 F.2d 302 (2d Cir. 1973); *United States v. Boatner,* 478 F.2d 737, 740 (2d Cir.), *cert. denied,* 414 U.S. 848, 94 S.Ct. 136, 38 L.Ed.2d 96 (1973); and *United States v. Curcio,* 279 F.2d 681, 682 (2d Cir.1960).

■ Accusations regarding the conduct of a trial judge require an in-depth examination of the transcript. This we have made, and found Judge Platt's performance far from wanting. Repeated defense objections were properly overruled. While counsel was occasionally admonished, it was due to repetitious conduct or questions which were clearly improper. A number of Toner's specific objections relate to the examination and cross-examination of Kail, which we have already discussed above. While we have explored all of Toner's allegations of unfairness, we will use three examples of the allegedly partial conduct of the judge about which Toner complains to show why and how we believe the trial court behaved appropriately.

According to Toner, Judge Platt helped FBI Agent Gregory Auld during cross-examination by Toner's counsel. Agent Auld was responsible for supervising Sydney Kail but was not the agent in charge of this

---

**8.** It matters not in either the hypothetical I just posed to you or the facts in this case, if possession, actual, joint and/or constructive, if you find such possession, was for ten seconds, five seconds, 30 seconds, one minute. The crime is complete when the transfer occurs. Indeed, if the FBI agent who was with, allegedly with Mr. Toner in Mr. Toner's car, had stepped out of the car and stepped away from the car and other agents at that moment, even before Mr. Toner had started the car, had taken off, had arrested Mr. Toner, Mr. Toner was in actual possession of the firearms in question and the offense had been fully completed at that moment. Indeed, might well have been said to have been fully completed at the moment when it was put in the trunk of the car and the agent and Mr. Toner got into the car, because he was in possession, Mr. Toner was in possession of the car. It was his car, the car that had been loaned to him and, of course, not to the FBI agent.

case. Called by the defense, Auld was pressed on the dates of the four taped meetings between Murphy and Agent De-Vecchio. At one point Auld indicated that he was unsure when the second meeting occurred, but that he believed all meetings were recorded and that he thought the second meeting took place sometime around the end of April, maybe a week or two after that, and that he did not know whether the third meeting took place on June the 2nd. When counsel continued to press Auld on dates, with the witness repeating that he was simply not sure when the meetings occurred, the government prosecutor said he would stipulate that the second meeting was on the 2nd of June. The court commented that the witness did not remember the date of that meeting. Defense counsel then stated, in front of the jury, "if [Auld] heard a recording of a meeting at the end of April, stipulating that it was June 2nd is not the evidence that the agent is giving." This remark was confusing and inaccurate, and it prompted the court quite properly to correct defense counsel by saying, "[Auld] said he attended three meetings. He thinks the second one was two or three weeks after the first." Defense counsel then said "and he believes it was recorded." The court said "[t]hat's right. Four meetings have been played here, one April, one June 2nd, July 15 and the last one July 21st." Defense counsel then incorrectly stated "and the agent testified to a meeting that he overheard that he believed was recorded that we haven't heard about. I have no other questions." The agent simply did not so testify. Counsel was wrong and the court had merely responded to him. The whole matter was, in any event, subsequently dropped. All four tapes of all four meetings had been played for the jury.

Another specific instance of the court supposedly rehabilitating a government agent was with respect to Agent Stephens, who was asked about the number of people who lived in the area where Toner resided. The exact question asked on cross was "[d]o you have any idea how many live in that area?" The answer was "[i]t was densely populated, especially on that night." The next question on cross-examination was the sarcastic "[t]here weren't more people living there on that night than others, is that correct?" After the government objected, the court said "I guess you saw a lot of people?" The witness replied "[a] lot of people live there." The agent evidently had misspoken regarding a totally inconsequential matter. It is inconceivable that the court's intervention was harmful to the defendants or showed partiality to the witness or the prosecution.

Toner argues that "the surest indicator to the jury that the judge was pro-prosecution was his treatment of defense witnesses." Mention is made of Bridget Brannigan who was called as a witness for Colm Murphy and as a character witness for Vincent Toner. When asked by defense counsel whether she had made trips from Ireland to the United States before she became an American citizen she began to answer "I was born in Northern Ireland and I accepted—" when the court intervened to say "wait a minute. The question doesn't call for a speech. When you were not a citizen, did you make trips?" Doubtless the court feared that her non-responsive answer to the effect that she was born in Northern Ireland reflected her intention to begin testifying about the conflict and conditions in Northern Ireland, a subject that the court had repeatedly foreclosed but which the defense continuously attempted to bring into the case. Moreover, the court had specifically made a ruling before Brannigan took the stand that she could not testify as to the conflict in Northern Ireland. In view of the non-responsiveness of the witness, the court was neither demonstrating partiality nor committing prejudicial error when it admonished the witness not to make a speech. Perhaps the choice of words might have been better, but this was a highly charged and emotional trial involving volatile, yet extraneous issues, the delving into of which could have created serious problems. No trial is perfect and there is no reference in the Toner brief to any other instance in which a defense witness's testimony was thus "demeaned."

We have examined the record closely in respect to the thirty-seven or so incidents in which the judge is said to have taken a posture as to the defense lawyers which was one of "outright hostility." For the most part, we view the instances as induced by counsels' own lack of familiarity with the rules of evidence, their efforts to provoke the court, or their attempts to get into evidence or into their summations matters which the court had previously excluded, such as the Hanratty evidence or evidence as to conditions in Northern Ireland.

Our examination of the trial transcript, which exceeds 2600 pages, indicates that the court dealt evenly with counsel for both sides. The court gave defense counsel the opportunity before trial to examine thoroughly Hanratty and Kail. Judge Platt very carefully reviewed the government's 100 plus pages of tape transcripts, seriously entertained the defenses' objections, was careful to give Murphy an entrapment charge and otherwise conducted as fair and impartial a trial as could be had in light of defense counsel's own conduct.

III. *The Issue of Entrapment.*

Murphy argues that the court's charge on the issue of entrapment was erroneous in that it did not refer to Murphy's lack of knowledge that the guns were unregistered or refer to the fact that there was no application for registration on file, or refer to the fact that there were registration requirements. To rebut an entrapment defense, the argument runs, the government must establish that the defendant was predisposed to commit the particular offense charged, as opposed to being generally predisposed to violate the law. *See United States v. Hawke,* 505 F.2d 817, 822 (10th Cir.1974), *cert. denied,* 420 U.S. 978, 95 S.Ct. 1404, 43 L.Ed.2d 658 (1975). Murphy claims that since it is the lack of registration or the lack of an application on file which makes receipt or possession of the gun a crime, *see United States v. Bass,* 404 U.S. 336, 339 n. 4, 92 S.Ct. 515, 518 n. 4, 30 L.Ed.2d 488 (1971), an interest in obtaining guns does not necessarily indicate or establish a predisposition unlawfully to possess unregistered guns. Murphy adds that undercover agent DeVecchio testified that he never told Murphy that the firearms had or had not been registered.

■ But it is clear that the crime is committed whether or not the possessor of an unregistered weapon knows about the registration requirements. *United States v. Freed,* 401 U.S. 601, 607–10, 91 S.Ct. 1112, 1117–18, 28 L.Ed.2d 356 (1971); *United States v. Mayo,* 705 F.2d at 78. Ignorance of the registration requirements simply does not play any role in a defense predicated on negating the mental state required for commission of the crime. *United States v. Freed,* 401 U.S. at 607–10, 91 S.Ct. at 1117–18. Moreover, evidence from the tape recordings indicated that Murphy did know that "we're talking about weapons that must have been got somewhere illegally"; he was, after all, dealing with what he thought was the Mafia. Also, the guns involved were M–16 machine guns. As the Supreme Court noted in *Freed,* as to hand grenades, "one would hardly be surprised to learn that possession . . . is not an innocent act." 401 U.S. at 609, 91 S.Ct. at 1118. *See also id.* at 616, 91 S.Ct. at 1121 (Brennan, J., concurring) (act covers "major weapons such as machineguns . . . [and] [w]ithout exception, the likelihood of governmental regulation of the distribution of such weapons is so great that anyone must be presumed to be aware of it"). *See also United States v. Bennett,* 709 F.2d 803, 806 (2d Cir.1983).

■ Toner, in turn, argues that he was entitled to an entrapment charge, which the court did not give. His argument is that the alleged inducement communicated to Murphy by the government agents was communicated to him by Murphy and that, even if such evidence is lacking, he nevertheless deserved the entrapment charge under *United States v. Valencia,* 645 F.2d 1158, 1168 n. 10 (2d Cir.1980), (*Valencia I*). But as *Valencia I* and the subsequent opinion on appeal after remand, 677 F.2d 191 (2d Cir.1982) (*Valencia II*), indicates, there *is* a burden of showing that the government's inducement was directly communi-

cated to the person seeking an entrapment charge, and Toner's evidence does not meet this requirement. The most that can be said from the evidence on the record is that the FBI was interested in knowing whether Murphy was involved with others, which is quite different from saying that the FBI consciously recruited someone to help Murphy commit the crimes. It was Murphy himself who first raised the fact that he would be accompanied by someone else and who persisted in the plan even when DeVecchio suggested to him that he would rather do the deal alone. The fact that Murphy and Toner socialized at a bar is simply not sufficient evidence of direct communication of the inducement to permit the question even to go to the jury. *Valencia II,* 677 F.2d at 192.

Nor is the question that was left open in footnote 10 of *Valencia I*—"whether a defendant may raise an indirect entrapment defense when an intermediary brings him into a scheme that was generated by a government agent, but where the defendant is not made aware of any importuning by that agent or has not been introduced to that agent," 645 F.2d at 1168 n. 10,—any longer open in this court. In *Valencia II* we first dismissed appellant's argument that the fact of the marital relationship was sufficient to raise an inference of "direct communication" to a spouse of the government agent's inducement of the other spouse. We then held that appellant, whose circumstances very closely resembled those set forth in footnote 10 to *Valencia I,* was not entitled to an entrapment charge, and so holding, closed the previously open question. Moreover, in *United States v. Myers,* 692 F.2d 823, 840 n. 13 (2d Cir.1982), *cert. denied, sub nom. Lederer v. United States,* —— U.S. ——, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983), it was said that "[g]overnment responsibility has been rejected where the circumstances showed [that] . . . an agent induces a middleman to commit a crime, and the middleman, responding to the pressure upon him, takes it upon himself to induce another person to participate in the crime." *See also* Note, *Entrapment Through Unsuspecting Middlemen,* 95 Harv. L.Rev. 1122, 1127–29 (1982).

## IV. *Due Process.*

Both appellants argue that the government's conduct was so outrageous that the indictment should have been dismissed as a matter of law. According to appellants, it was outrageous for the government to turn them into criminals by having them touch unregistered weapons that the government could and should have registered. *See United States v. Russell,* 411 U.S. 423, 431, 93 S.Ct. 1637, 1642, 36 L.Ed.2d 366 (1973). The argument is that the government itself was directly responsible for the *corpus delicti* by providing the illegal material, namely, unregistered weapons.

But Murphy and Toner were not simply law abiding citizens who had never before been involved in this kind of activity. The Murphy tapes and other evidence at trial demonstrate that Murphy was violating the law and pursuing criminal activities on the West Coast and elsewhere long before Kail and DeVecchio appeared. The April 21, 1982, tape, for example, has Murphy saying "the price that we paid for the last M–16s we bought was uh 300 dollars.... We have a hundred thousand pounds sterling at home ...." Toner's statements to Agent Stephens about their being "ripped off" in the past, coupled with his inspection of the guns during the sale, indicate that he was also familiar with illegal weapons and their procurement. As for the argument that the Government *could* have registered the guns, we agree with the Government that the Drug Enforcement Agency *could* choose to supply buyers with sugar instead of heroin; nevertheless convictions of buyers of heroin have been consistently upheld against due process attack. *United States v. Romano,* 706 F.2d 370, 372–73 (2d Cir.1983); *United States v. Nunez-Rios,* 622 F.2d 1093, 1097 (2d Cir.1980). As we have also said in an analogous context, the "Due Process Clause does not forbid [the] 'use of dishonest and deceitful informants,'" *United States v. Mayo,* 705 F.2d at 77, citing *United States v. Myers,* 692 F.2d at 846.

## V. *Murphy and Possession.*

Murphy argues that he never had actual or constructive possession of the guns in that he never had the intent and the power to exercise control over the firearms. Murphy concedes (as indeed he must) that he may have had the requisite intent to possess while waiting at the White Castle restaurant, if not before, but he insists that the presence of the federal agents who had been instructed not to lose possession of the firearms prevented him from exercising control over those firearms. As authority, Murphy cites *United States v. Hurd,* 642 F.2d 1179, 1182 (9th Cir.1981) (government informant left certain firearms for storage in Hurd's garage with Hurd's consent and participation; held no transfer within 26 U.S.C. § 5845(j) (1976)); *see also United States v. Daniels,* 527 F.2d 1147, 1150–51 (6th Cir.1975) (circumstantial evidence connecting defendant with firearms too insubstantial to show possession).

 But Murphy entirely misstates the law. *Hurd* was not a possession case. The issue there was whether the act of storing weapons constituted transfer, not possession, an altogether different question. More on point are the cases involving drugs, where undercover agents accompany the defendants from sale through arrest. *See, e.g., United States v. Modica,* 663 F.2d 1173, 1176 (2d Cir.1981) (controlled delivery and search for contraband), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). The sixty seconds or so that the weapons were in Toner's car between the time he drove unmolested from the White Castle parking lot to the time he was stopped half way down the block was sufficient to establish his actual and Murphy's constructive possession. *See United States v. Sanders,* 462 F.2d 122, 124 (6th Cir.1972) ("[t]he length of time of the possession is not material . . .").

## VI. *Section 1202(a)(5) and Equal Protection.*

 Murphy was convicted under Count Four of violating 18 U.S.C.App. § 1202(a)(5) (1976), which makes it a felony for an illegal alien to receive, possess or transport "in commerce or affecting commerce . . . any firearm." Because receiving, possessing or transporting firearms in interstate commerce is not in and of itself a crime, *United States v. Bass,* 404 U.S. at 339 n. 4, 92 S.Ct. at 518 n. 4, and because being an illegal alien is not in and of itself a crime, Murphy argues that his Fifth Amendment right to equal protection of the law is violated by section 1202(a)(5). He concedes, however, that the statute passes constitutional muster if it rests on a rational basis, a concession which is clearly correct since the right to possess a gun is clearly not a fundamental right, *cf. United States v. Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939) (in the absence of evidence showing that firearm has "some reasonable relationship to the preservation or efficiency of a well regulated militia," Second Amendment does not guarantee right to keep and bear such a weapon), and since illegal aliens are not a suspect class.

The statute prohibits possession of firearms not only by illegal aliens, but also by ex-felons, dishonorably discharged soldiers, and mental incompetents. It was enacted in response to the wave of political and civil rights assassinations during the 1960s. *See Stevens v. United States,* 440 F.2d 144, 160–61 (6th Cir.1971). As Justice Marshall observed in *Scarborough v. United States,* 431 U.S. 563, 572, 97 S.Ct. 1963, 1967, 52 L.Ed.2d 582 (1977):

> The legislative history [of 18 U.S.C. App. § 1202] in its entirety, while brief . . . supports the view that Congress sought to rule broadly—to keep guns out of the hands of those who have demonstrated that "they may not be trusted to possess a firearm without becoming a threat to society." (citing 114 Cong.Rec. 14773 (1968))

 Illegal aliens are aliens who have already violated a law of this country. They are subject to deportation. *See* 8 U.S.C. § 1251(a)(9). Moreover, illegal aliens are those who, as the district court said, "[are] likely to maintain no permanent address in this country, elude detection

through an assumed identity, and—already living outside the law—resort to illegal activities to maintain a livelihood." As the district court further noted, "one seeking to arrange an assassination would be especially eager to hire someone who had little commitment to this nation's political institutions and who could disappear afterwards without a trace . . . ." CR82–00377 (E.D. N.Y. May 17, 1983) (order denying motion to dismiss Count Four of the indictment). *See also,* 114 Cong.Rec. 14774 (remarks of Senator Long). No one would dispute that the statute strikes broadly—that was the expressed Congressional intention—and that not all illegal aliens (or ex-felons, for that matter) are disreputable, or unworthy of society's trust. *See Yiu Sing Chun v. Sava,* 708 F.2d 869 (2d Cir.1983). But that is not the issue, and we believe that the prohibition of the statute bears a rational basis to its justifiable goals.

### VII. *Severance.*

▮ Toner argues that failure to grant a severance was reversible error. *See* Fed. R.Crim.P. 14. But in order to show reversible error based on a court's refusal to grant a co-defendant a separate trial, it must be demonstrated that the defendant suffered substantial prejudice due to the joint trial. It is immaterial whether the defendant would have had a better chance of acquittal. In other words, "some" prejudice does not warrant reversal. *United States v. Weisman,* 624 F.2d 1118, 1129–30 (2d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980); *United States v. Werner,* 620 F.2d 922, 928 (2d Cir.1980).

▮ Toner's argument is based on the alleged prejudicial spillover of Murphy's taped conversations with the FBI agents. But Murphy's statements would have been admissible even at a separate trial of Toner's in connection with the proof of the conspiracy. *See* Fed.R.Evid.Rule 801 (d)(2)(E); 4 J. Weinstein and M. Burger, *Weinstein's Evidence* at 801—166–85 (1981). In addition, separate trials would have been costly in terms of judicial and prosecutorial resources, and while this factor is by no means dispositive of the severance issue, it is a consideration which appellate courts must assess in reviewing a joint trial. *See United States v. Losada,* 674 F.2d 167, 171 (2d Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). Hence we find no error in the refusal to grant Toner a separate trial.

### VIII. *Lack of Aliens on the Jury.*

Toner makes an extensive argument that the indictment should have been dismissed because the exclusion of aliens from a jury, petit or grand, deprives an alien defendant of a Sixth Amendment right to an impartial jury and a Fifth Amendment right to a proper indictment. The argument is, of course, that the systematic exclusion of aliens violates the "fair cross section" requirement announced and applied by the Supreme Court in such cases as *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979) and *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).

▮ But, historically, state governments have had the "power to exclude aliens from participation in [their] democratic political institutions." *Sugarman v. Dougall,* 413 U.S. 634, 648, 93 S.Ct. 2842, 2850, 37 L.Ed.2d 853 (1973). Jury service is one of the most fundamental of democratic institutions. *See Foley v. Connelie,* 435 U.S. 291, 296, 98 S.Ct. 1067, 1071, 55 L.Ed.2d 287 (1978). As the Court stated in that case, "it is clear that a State may deny aliens the right to vote, or to run for elective office, for these lie at the heart of our political institutions. Similar considerations support a legislative determination to exclude aliens from jury service." *Id.* (citations omitted). *See also United States v. Gordon-Nikkar,* 518 F.2d 972, 976–77 (5th Cir.1975) (Congress may require citizenship of federal jurors); *Perkins v. Smith,* 370 F.Supp. 134, 138 (D.Md.1974) (three judge court) (not a denial of equal protection to omit aliens from juries), *aff'd without opinion,* 426 U.S. 913, 96 S.Ct. 2616, 49 L.Ed.2d 368 (1976).

Nor does *Plyer v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) require a different result. That case held that a Texas statute which withheld from local school districts state funds for the education of alien children and which authorized local school districts to deny enrollment to such children violated the Equal Protection Clause of the Fourteenth Amendment. *Plyer* was concerned with the issue of a state government's power to place disabilities upon the "innocent" children of illegal aliens; the opinion stressed the children were "not accountable for their disabling status." *Id.* at 223, 102 S.Ct. at 2398. The opinion in no way addressed the federal government's immigration power and in no sense involved federal criminal proceedings. As the *Gordon-Nikkar* court observed, "while most *state* classifications based on alienage are inherently suspect ... the same is not true of all such federal classifications where Congress' plenary authority in the field of immigration is involved." 518 F.2d at 977 (citations omitted). We agree with the Fifth Circuit that neither due process nor equal protection of the law is involved in the time-honored federal system of drawing petit and grand jurors only from citizens of this country. *See United States v. Avalos,* 541 F.2d 1100, 1118 (5th Cir.1976), *cert. denied,* 430 U.S. 970, 97 S.Ct. 1656, 52 L.Ed.2d 363 (1977).

## CONCLUSION

We have reviewed this case with care. This opinion does not deal with all of the myriad arguments advanced by the appellants, but we have considered each of their arguments and found them all unavailing. In sum, we think the evidence shows that the appellants were plainly guilty, that the Government acted properly in obtaining their convictions, and that the court acted fairly throughout its handling of the trial.

Judgment affirmed.